TERRELL, ATKINS & HARVIN v. PROCTOR et al. (No. 5366.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 20, 1915.)

1. SALES (§ 391*)—BREACH—RECOVERY OF DEPOSIT.

Where plaintiff deposited $5,000 as a penalty to secure performance of their contract to purchase certain cattle from defendants, facts showing that defendants suffered no injury from plaintiff's alleged breach of their contract were sufficient to entitle plaintiff to recover the deposit.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1110–1127; Dec. Dig. § 391.*]

2. SALES (§ 89*)—MODIFICATION—CONSIDERATION—NECESSITY.

Parol modification of a pre-existing contract for the sale of cattle as to the manner in which the seller should accept payment was unenforceable, unless supported by a new consideration.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259; Dec. Dig. § 89.*]

3. SALES (§ 89*)—CONTRACT—MODIFICATION—PAYMENT.

A seller's agreement to accept payment for cattle in a manner different from that prescribed by the contract was sustained by a sufficient consideration, consisting of the buyer's subse-

quent agreement to take the loss of all cattle which might die or be injured in the pens during the night before delivery.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 251, 252, 259; Dec. Dig. § 89.*]

**4. TENDER (§ 16*)—WAIVER.**

Payment need not be tendered if the person required to make the tender is informed by the person to receive it that it will not be accepted, provided the former proves ability to make payment, as required by the contract.

[Ed. Note.—For other cases, see Tender, Cent. Dig. §§ 47–53; Dec. Dig. § 16.*]

**5. APPEAL AND ERROR (§ 930*)—JUDGMENT—INVALIDITY—REVERSAL.**

Where a special verdict is insufficient in itself to support the judgment, it will be reversed, unless there is evidence in the statement of facts which sustains the necessary findings to complete the verdict.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3755–3761; Dec. Dig. § 930.*]

**6. SALES (§ 418*)—BREACH—SPECIAL DAMAGES—NOTICE.**

Where plaintiffs, prior to an alleged modification of a contract for the sale of certain cattle, notified defendants of their intention to ship the cattle to A., such information did not put defendants on notice that the cattle were to be sold at once in the open market at A., so as to entitle plaintiffs to recover, as special damages, the difference between the contract price and the market value of the cattle at A., less freight, under the rule that, to entitle the buyer to recover such damages, the seller must know that the goods are bought for resale in a particular market, or are to be supplied in pursuance of a particular contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. § 418.*]

**7. SALES (§ 418*)—BREACH OF CONTRACT—SPECIAL DAMAGE.**

Where, in an action for breach of a contract to sell certain cattle, there was evidence as to the value of the cattle at the place of delivery, and the jury found their reasonable value there, an allowance of special damage, based on the theory of the difference in value between the contract price and the value of the cattle at the destination to which they were to be shipped, less the freight, was unsustainable.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. § 418.*]

**8. EVIDENCE (§ 142*)—VALUE—OTHER SALES.**

The price paid by a buyer on resale of certain cattle bought from defendants was immaterial in an action for breach of the seller's contract to deliver.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 416–423; Dec. Dig. § 142.*]

**9. SALES (§ 418*)—CONTRACT—SELLER'S BREACH—DAMAGES.**

In an action for a seller's breach of a contract to sell certain cattle, the amount the cattle were damaged by being penned and driven to the place of delivery was immaterial.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. § 418.*]

**10. SALES (§ 418*)—CONTRACT—SELLER'S BREACH—MARKET VALUE.**

In an action for a seller's breach of contract to sell cattle, the jury are at liberty to fix the reasonable value of the cattle at their market value at the nearest market, less freight.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 1174–1201; Dec. Dig. § 418.*]

Appeal from District Court, Bexar County; W. F. Ezell, Judge.

Action by T. E. Proctor and another against Terrell, Atkins & Harvin. Judgment for plaintiffs, and defendants appeal. Reformed and affirmed.

Houston, Boyle & Storey, of San Antonio, and J. R. Sanford, of Eagle Pass, for appellants. C. C. Clamp and C. A. Davies, both of San Antonio, for appellees.

MOURSUND, J. Appellees T. E. Proctor and C. E. Canterbury, plaintiffs below, sued appellants, alleging: That about May 20, 1913, plaintiffs entered into a contract whereby they agreed to purchase from defendants all of a certain stock of cattle estimated at 2,000 head, more or less, ranging in the Frank Payne pasture near Spofford, and to pay $20 in gold per head, f. o. b. cars Spofford, Tex., all calves born since January 1, 1913, to be thrown in free of cost; that by the terms of the contract the cattle were to be delivered in three separate bunches, the first to be delivered within ten days from date of contract, the other two to be made upon securing reasonable notice from plaintiffs, but all were to be delivered and received on or before August 1, 1913; that prior to said date plaintiffs received and paid for approximately 1,015 head of cattle and 362 head of cattle, and that defendant, in making such deliveries, cut out and delivered the smallest and poorest of the cattle, leaving about 1,025 head which were the best cattle; that plaintiffs had a train of cars ready for the receipt of said cattle, and they had rounded up and were ready for delivery, and had procured the Frost National Bank of San Antonio, Tex., to certify a payment of $15,000 upon said cattle to the Border National Bank of Eagle Pass, Tex., and upon the evening of August 1, 1913, the defendants agreed to accept the certification by the Frost National Bank in payment of the balance due on said last delivery of cattle and to load the same on July 2, 1913; that plaintiffs had procured the deposit of said sum in the said Frost Bank and said bank to certify the same to said Border National Bank for payment to said defendants, with bill of lading attached; that, at the time of making the contract, plaintiffs had deposited with defendants $5,000 as a guaranty of the fulfillment of the contract on the part of plaintiffs, which was to be deducted from amount to be paid for the last bunch of cattle, but defendants refused to load the cattle and to accept the certified payment from the Frost Bank, also refused to return said $5,000, and refused to deliver said cattle as agreed in said contract and as agreed on the evening of August 1, 1913. Plaintiffs alleged their damages at $12 per head on 200 cows with calves, $4.50 per head on 200 dry cows, and $11.50 per head on 500 steers, basing same on the mar-

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

ket value at San Antonio, Tex., less expense of transportation, alleging that said market was the nearest to Spofford, and that defendants knew of plaintiffs' intention to ship same to San Antonio. Plaintiffs prayed for judgment for their damages, so set out, in the aggregate amount of $9,050, besides the $5,000 deposited with defendants. The contract attached to the petition as an exhibit contains the provisions pleaded, and in addition provided that plaintiffs were to pay for the cattle, as they were received, with check on any of the banks in Eagle Pass, Tex.

Defendants filed a general demurrer, and in answer to the petition admitted the execution of the contract and that deliveries of cattle were to be made thereunder, as set out in the petition, but denied that at divers times prior to August 1, 1913, they delivered 1,015 head and 362 head to plaintiffs, and specially denied that they cut and delivered the smallest and poorest cattle, and that there remained about 1,025 head which included the best cattle, and averred that they delivered only about 1,225 head of cattle prior to said August 1st, which were of the average run of the stock contracted to be sold, and were received by plaintiffs without protest. Defendants further alleged that the last round-up of cattle consisted of about 950 head. They denied that the Frost National Bank certified the payment of $15,000 upon the cattle so rounded up to the Border National Bank of Eagle Pass, Tex., or of any other sum at said bank, and averred the fact to be that said Frost Bank wired defendants that they would pay Otto Limburger's draft on Schweers-Kern Live Stock Commission Company for $15,000 in payment of 1,000 cattle, calves not counted, bill of lading attached, which telegram had no bearing on the contract and in no wise complied with the terms and conditions thereof, and was therefore of no concern to defendants. They also denied that they or either of them ever agreed to accept the certification of the said Frost Bank, as alleged in said petition, in payment for said cattle, or agreed to load the same on August 2, 1913, on such certification, or agreed to accept payment therefor in any manner, except that provided in the contract. Defendants also pleaded so as to put in issue the other allegations of plaintiffs' petition, except that relating to the deposit of $5,000 with them by plaintiffs, but pleaded that said sum was deposited as a forfeit and as liquidated damages to be retained by defendants if plaintiffs failed to carry out their contract. By way of cross-action defendants pleaded that they strictly complied with all the terms of said contract, and had the balance of the cattle, approximating 1,000 head, penned and ready for delivery, but plaintiffs failed and refused to accept same, whereby defendants were damaged in the sum of $5,923, the items whereof were specifically set out. Their prayer was

for judgment for said amount, and that they be adjudged entitled to retain the $5,000 deposited with them by plaintiffs.

Plaintiffs demurred to the answer and cross-action, and pleaded that the contract called for delivery of the cattle f. o. b. cars Spofford, and defendants demanded payment or assurance of payment before delivering the cattle as thus provided; that in compliance with said demand, which constituted a breach of the terms of the contract, plaintiffs furnished defendants on August 1, 1913, a telegram from said Frost Bank that it would honor a draft of Otto Limburger (who was present and representing and assisting plaintiffs) upon the Schweers-Kern Commission Company for $15,000, which, with the $5,000 deposit, would have paid for the 1,000 head of cattle at $20 per head and more than paid for the 950 head which defendants alleged were ready for delivery; that defendants agreed to accept payment by said method and to deliver the cattle on August 2d; that said arrangement was a substantial compliance with the contract, as the offer of the Frost Bank was cash at the Border National Bank in Eagle Pass, and further that defendants precluded plaintiffs from making any other or further tender of said money under the contract, and are estopped, by reason of their agreement and action, from alleging a failure to pay or offer to pay for the cattle in accordance with the strict letter of said contract, and therefore are liable for the sum sued for. Plaintiffs denied that the contract contemplated, or that the parties contemplated, that the $5,000 was deposited as liquidated damages. They also denied the allegations of defendants' cross-action, and averred that defendants breached the contract in the first instance by failing to load and count the cattle into the cars.

Defendants, by supplemental answer, denied the allegations made in plaintiffs' supplemental petition, and alleged that the contract simply called for delivery of the cattle free on cars, but it was the agreement and custom of the parties that plaintiffs were to arrange so they could give a draft on some bank in Eagle Pass, and defendants did not demand that plaintiffs draw a check for any fixed sum, but simply to know whether plaintiffs were in a condition to pay for the cattle when put in the cars; that at each former delivery plaintiffs caused much delay in placing their money in banks at Eagle Pass, and therefore, to save damage to said cattle by holding them in the cars, defendants permitted them to remain in the pens ready to be placed in the cars when plaintiffs could assure defendants that they were in a condition to carry out the contract; that the telegram, purporting to be from Frost, related to different cattle than those covered in said contract, and cattle which defendants did not have; that it did not comply with the contract because it added that the calves

were not to be counted, whereas under the contract all calves born prior to January 1, 1913, were to be counted, of which kind defendants had about 100 head, and with them defendants only had 964 head to be delivered under the contract; that, when defendants were shown a copy of the telegram, they notified plaintiffs that it was not in accordance with their agreement; that they proposed to sell their cattle at Spofford and not in San Antonio; that, if they could procure any bank in Eagle Pass to cash the draft or to cash a check for the balance of the cattle to be delivered, defendants would load the cattle; that plaintiffs attempted to arrange such matter, but were unable to do so, and on August 2d informed defendants they had done all they could and could do no more. Whereupon defendants placed the cattle in their pasture.

Defendants, by trial amendment, amplified their former pleadings, reiterated all items sued for in their cross-action, except one, and in addition sued for $500 for pasturage and care of the cattle for 30 days intervening before they could be sold. Plaintiffs also filed a trial amendment, consisting of various special exceptions, and a denial of the allegations contained in defendants' trial amendment.

In answer to special issues submitted, the jury found: That defendants agreed to accept payment for the cattle from Mr. Limburger, as proposed in the telegram from Frost National Bank to Terrell & Harvin on August 1, 1913, introduced in evidence, and to load out the cattle the next day; that there was no market value at Spofford on August 2, 1913; that the reasonable value per head of the cattle at Spofford on August 2, 1913, in their then condition, was $20; that there was a market value for the cattle in San Antonio on August 3, 1913, in the condition they would have been in upon arrival there, if shipped there; that such value was $26 per head; that defendants received $21 per head when they sold the cattle to Clamp & West on August 22, 1913; that the reasonable value of the pasturage and care of said cattle from August 2, 1913, to August 22, 1913, was 17½ cents per head.

The court rendered judgment in favor of plaintiffs for the $5,000 deposited by them with defendants, and for the further sum of $5,061 damages.

It is apparent that the verdict furnishes no sufficient basis for that part of the judgment awarding plaintiffs $5,061 in addition to the $5,000 deposited by plaintiffs. We are compelled to resort to the statement of facts to ascertain whether there is evidence to support findings in favor of plaintiffs upon all issues not submitted. Our conclusions of fact upon matters deemed material are as follows:

(1) In one portion of the contract the place of delivery was stated as Spofford, Tex., while in another it was stated as Eagle Pass, Tex., but all parties to the suit treated the contract as requiring delivery at Spofford.

(2) The defendants on August 1, 1913, were ready, able, and willing to deliver at Spofford, Tex., 964 head of cattle called for in the contract to be paid for at $20 per head.

(3) A discussion between the parties disclosed that plaintiffs were unable to pay for the cattle, as provided in the contract, and that they were relying upon one Otto Limburger and the Schweers-Kern Live Stock Commission Company to finance the deal for them. The fact was developed that Limburger, who was upon the ground, and as plaintiffs' representative took charge, in a large measure, of the negotiations, was unprepared to pay, as provided in the contract.

(4) About the middle of the afternoon Limburger proposed that he would draw a draft on the Schweers-Kern Commission Company in San Antonio, and procure the Frost National Bank of San Antonio to O. K. it and have the Eagle Pass Bank pay it. Plaintiff Proctor testified this proposition was accepted by defendants.

(5) Limburger did not comply with his proposition so made, but about 8 o'clock that night a telegram was received by defendants from Frost National Bank reading as follows:

"We have wired Border National Bank that we will pay Otto Limburger draft on Schweers-Kern Live Stock Commission Co. fifteen thousand bill of lading attached for one thousand head of cattle, calves not counted."

(6) In deference to the verdict, the evidence being conflicting, we find that, shortly after receiving this telegram, defendants unconditionally agreed to accept the payment by the method therein specified and to load the cattle the next morning; it being impracticable to load that night because a few of plaintiff Proctor's cattle were in the pens with defendants' cattle and could not be separated therefrom on account of darkness.

(7) The agreement by the bank to pay as per telegram was not an agreement by the bank to carry out the proposition as made by Limburger earlier in the day, because it imposed for the first time the condition that there must be attached to the draft a bill of lading for 1,000 head of cattle, calves not counted.

(8) Shortly after agreeing to accept payment as proposed in the telegram, defendants exacted of plaintiffs an agreement that, if any cattle died during the night, they would be counted and plaintiffs would lose the value thereof.

(9) Within an hour and a half after receipt of the telegram, defendants informed plaintiffs they could not accept draft with bill of lading attached; that they had communicated with the Eagle Pass bank, and had been told that such draft would not be satisfactory to said bank. Thereupon Limburger agreed to procure the elimination of the provision requiring that bill of lading be attached to

draft, and that night and the next morning sought to telephone Schweers and get the change made.

(10) The next morning, the evidence as to time being conflicting, defendants drove their cattle back to their pasture. Limburger testified that defendants declined to wait further, although he assured them he would do everything in his power to get Schweers and the Frost Bank to eliminate the bill of lading feature. According to defendants' testimony, Limburger told them he could do nothing further. Limburger testified that the commission company refused to eliminate the bill of lading provision, but it seems his contention is that such refusal occurred after the cattle had been turned out.

(11) The evidence does not show that plaintiffs were able to pay defendants on August 2, 1913, by draft with bill of lading attached for 1,000 head of cattle, calves not counted. Defendants had only 964 head, including 50 or 60 calves born prior to Jan. 1, 1913, and therefore to be counted under the contract, but which were not to be counted in providing a bill of lading according to telegram, so far as is shown by the testimony. It is true the evidence discloses that plaintiff Proctor had a few head of cattle in the pens, but the number is not stated.

(12) On August 1, 1913, plaintiff Proctor told defendants that he intended to ship the cattle to San Antonio. There is no evidence that he told them what he intended to do with the cattle when they got to San Antonio.

(13) The freight on the cattle from Spofford to San Antonio would not have exceeded 75 cents per head.

Our conclusions of law are as follows:

[1] (1) The court did not err in overruling the general demurrer to plaintiffs' petition. The petition states a cause of action for the recovery of the $5,000 deposited, as it is shown to be a penalty, and facts are alleged which, if true, show that defendants suffered no injury, and therefore were not authorized to hold the deposit. Assignments of error Nos. 1 and 15 are overruled.

[2] (2) The court erred in submitting special issue No. 1, because no consideration was pleaded for the agreement on the part of defendants to accept payment otherwise than as specified in the contract. In fact, the agreement to accept draft payable only on condition that bill of lading was attached, as stipulated in the telegram, was never specifically pleaded, as will be seen by examining our statement of the pleadings. Plaintiffs, in their supplemental petition, pleaded that, by reason of the agreement by defendants to accept payment as therein pleaded, they (plaintiffs) were prevented from making payment as provided in the original contract, but there is no evidence to sustain such plea. We conclude that there is no merit in appellees' contention that the modification would be binding without any consideration

therefor. If so, no reason exists why Limburger's agreement to eliminate bill of lading provision did not supersede the first modification. In some states the courts have held that the consideration existing in an original executory contract is considered as imported into any new parol modification, and no new consideration need be shown, but we do not understand our courts to so hold. Whitsett v. Carney, 124 S. W. 443; Walker v. Tomlinson, 44 Tex. Civ. App. 446, 98 S. W. 906; Mayfield v. Cottón, 21 Tex. 1; Hogan v. Crawford, 31 Tex. 633; Bonzer v. Garrett, 162 S. W. 936; Consumers' Fertilizer Co. v. Badt & Co., 157 S. W. 226; Porter v. Metcalf, 84 Tex. 472, 19 S. W. 696.

[3] In this case plaintiffs were free to pay at any time as provided in the contract, and the agreement by defendants to accept payment in another manner did not even involve the relinquishing by plaintiffs of their right to pay in the method stipulated in the contract. The agreement to accept payment in accordance with the telegram was not supported by any consideration at the time it was made, but thereafter plaintiffs agreed to take the loss of all cattle which might die or be injured in the pens that night; and we think that such agreement constituted a valid consideration for defendants' agreement to accept payment as proposed in the telegram, but, there being no consideration pleaded, the assignments of error Nos. 3, 4, and 5 are sustained.

[4] (3) Plaintiffs were not required to tender payment, if informed by defendants that it would not be accepted, but nevertheless they must allege and prove that they were able to make payment as required by the contract. Brown v. Binz, 50 S. W. 484; Railway v. Dennison, 22 Tex. Civ. App. 89, 58 S. W. 834; Cyc. vol. 35, pp. 627, 628. In this case the evidence fails to show that plaintiffs were able to pay on August 2, 1913, by draft with bill of lading attached for 1,000 head of cattle, calves not counted, as is shown by our ninth conclusion of fact.

[5] (4) The error pointed out in the foregoing conclusion was not assigned, but, as the verdict is not sufficient in itself to support the judgment, such judgment is fundamentally erroneous and must be reversed, unless there is evidence in the statement of facts which sustains the necessary findings to complete the verdict. Armstrong v. Elliott, 20 Tex. Civ. App. 41, 48 S. W. 605, 49 S. W. 635; Loan & Trust Co. v. Fuller, 26 Tex. Civ. App. 320, 63 S. W. 552; Yzaguirre v. Garcia, 172 S. W. 139, recently decided by this court.

[6] (5) The court, in allowing plaintiffs $5,061 in addition to the $5,000 deposit, estimated the damages allowing the difference between the contract price and the market value at San Antonio, less freight, although there was a finding of the reasonable value of said cattle at the place of delivery. As the court allowed damages based upon the market value at a place other than the

one of delivery, special circumstances must have existed, and defendants must have had notice or knowledge thereof, in order for the court to be justified in allowing such damages. No such issues were submitted to the jury, so we must go to the statement of facts to see if there is any evidence to support the allowance of special damages. It is admitted that defendants had neither notice nor knowledge, at the time the contract was made, of special circumstances justifying special damages, but appellant contends that notice given prior to the breach is sufficient and relies upon the case of Bourland v. Choctaw R. R. Co., 99 Tex. 407, 90 S. W. 483, 3. L. R. A. (N. S.) 1111, 122 Am. St. Rep. 647, as authority for the proposition that the general rule announced in M., K. & T. Ry. Co. v. Belcher, 89 Tex. 428, 35 S. W. 6, is not applicable in all cases. True, the Bourland Case permits the recovery of special damages from a carrier for negligence in failing to deliver goods after their arrival, although notice of the special circumstances was not given until after arrival of the goods. For a discussion of such case and the Belcher Case, see note to 3 L. R. A. (N. S.) 1111. The instant case is not one where negligence is relied upon, but a case where damages are sought to be recovered for a breach of an ordinary contract between individuals. There are in certain relations, duties imposed by law, a failure to perform which is regarded as a tort, though the relations themselves may be formed by contract covering the same ground. Cooley on Torts (3d Ed.) p. 159. Carriers, telegraph companies, and bailees of property are mentioned as illustrations. The rule so stated has often been recognized in this state, and we see nothing illogical in giving effect in such case to notice of special circumstances, if made known prior to the commission of the tort. But the rules applicable to these exceptional cases must not be applied to cases such as this, where the only duties are those imposed by the contract. Therefore it is clear that unless a binding modification of the contract was made, and same is given the effect of making a new contract after defendants had notice or knowledge of the special circumstances relied upon, the same cannot be considered in measuring the damages. The evidence shows that Proctor told defendants he intended to ship the cattle to San Antonio, and that such statement was made prior to the agreement to accept payment as per telegram. But such information, especially in view of the class of cattle being shipped and their condition, did not put defendants on notice that such cattle were to be sold in the open market at San Antonio on August 3, 1913, or at any other time. Specialty Furniture Co. v. Kingsbury, 60 S. W. 1030; Daugherty v. Herndon, 27 Tex. Civ. App. 175, 65 S. W. 891. The notice or knowledge should apprise the seller of the fact that the goods are bought for resale in a particular market or are to be supplied in pursuance of a particular contract. Sutherland on Damages, § 52; Kirby Lumber Co. v. Cummings, 57 Tex. Civ. App. 291, 122 S. W. 273; Hamilton v. Schumacher, 15 S. W. 715; Anderson Electric Co. v. Water Co., 27 S. W. 504; Harris v. Bank, 45 S. W. 311; Globe Refining Co. v. Landa, 190 U. S. 540, 23 Sup. Ct. 754, 47 L. Ed. 1171. The facts and circumstances shown in this case are not sufficient to charge defendants with notice that the cattle were to be resold by plaintiffs in the market at San Antonio.

Terrell testified:

"Mr. Limburger told me he would give me a check on some one or he was to get it from Schweers-Kern Commission Company; he bought the cattle; and he was to draw through them; but I did not talk to him about the Frost Bank certifying to it."

Limburger testified:

"The market value of those cattle down on the ranch there was what I paid for them, $22.50 per head."

The testimony is much stronger to indicate that defendants were informed of a resale than that plaintiffs intended to sell the cattle on the San Antonio market.

Again Armstrong testified he bought the cattle from Proctor before August 1st, and told Harvin of such purchase. He testified further:

"Proctor came and we made another deal. He went in with us on the deal for the cattle, and we arranged shipment."

It seems that this is a suit by plaintiffs to recover their profits and also the profits that would have been made by purchasers from them. But, taking it for granted that plaintiffs would be the owners when the cattle reached San Antonio, defendants were left to surmise whether the cattle were to be sold upon the market at once, or, being thin, whether they were to be fed and then sold, or part sold and part used for breeding purposes, or whether they were to be shipped to another market.

[7] Appellees seek to defend the allowance of special damages upon the theory that, there being no market value at Spofford, the market value at the destination, less the freight, should furnish the basis for estimating the damages, and that for such reason the court did not err. If there had been no finding of the value at Spofford, we might conclude that the court found the value at Spofford by deducting freight from the market value at San Antonio, but the jury passed upon the question and found the reasonable value at Spofford to be $20 per head. The rule referred to is not one permitting the recovery of market value at other than the place of delivery, but one which, when there is no market value at place of delivery, permits evidence of the market value at the nearest market to be shown to be considered with freight charges, in determining the actual or intrinsic value at place of delivery.

Sutherland on Damages (2d Ed.) § 653. We may say in this connection that other evidence, besides that of Limburger, above quoted, was before the jury on the question of value at Spofford. Clamp testified he saw the cattle between August 8th and 15th, and would have paid something like $16 or $17 per head for them in their then condition. Kennedy testified the market value of the cattle at Spofford was $18 per head. Terrell estimated the value at $16 per head. The jury, after considering all the testimony, placed the value at $20, which finding could not be disregarded by the trial court. We conclude that upon no theory can the judgment be sustained as to the $5,061, and sustain all assignments of error complaining of that portion of the judgment.

[8] (6) The issue regarding the price paid by Clamp & West to appellants was an immaterial one, and it is unnecessary to determine whether the finding of the jury is supported by evidence. The ninth assignment of error is overruled.

[9] (7) The court did not err in holding that the amount the cattle were damaged by being penned and driven to the place of delivery was immaterial. The sixth and sixteenth assignments are overruled.

[10] (8) The finding that the reasonable value of the cattle at Spofford was $20 per head is supported by evidence, because the jury was at liberty to fix same by using the market value at San Antonio, the nearest market, less freight. The eighth assignment is overruled.

As the court erred in allowing special damages, and the value of the cattle at Spofford was the same as the contract price, the judgment will be reformed by eliminating the $5,061 item, but will be affirmed as to the $5,000 deposit.