Vernie WALKER, Independent Executrix of
the Estate of J. L. Walker, Deceased, Appellant,

v.

CENTRAL FREIGHT LINES, INC., et al.,
Appellees.

No. 14256.

Court of Civil Appeals of Texas.

San Antonio.

July 29, 1964.

Rehearing Denied Sept. 9, 1964.

Moursund, Ball & Bergstrom, San Antonio, R. Dean Moorhead, Austin, Kelley,

Looney, McLean & Littleton, Edinburg, Felts & Robinson, Austin, for appellant.

George Nokes, Waco, Carl Wright Johnson, Nat L. Hardy, San Antonio, for appellees.

MURRAY, Chief Justice.

This suit involves the equitable remedy of specific performance of a master contract, consisting of three separate contracts, dated June 30, 1956, whereby Central Freight Lines, Inc., agreed to purchase stock, or shares of stock, of three other Texas corporations, to-wit: Alamo Express, Inc., Alamo Cartage Co., and W. & H. Investment Co., from J. L. Walker and Louis E. Hart, Sr. The parties will hereinafter be referred to as "Central", "Express", "Cartage", "W. & H.", "Walker" and "Hart".

The suit began as an action for rescission of the contract, but by cross-action Central and W. W. Callan, hereinafter referred to as "Callan", sought the specific performance of the contract and damages, and the suit was actually tried on the cross-action. Walker owned sixty per cent of the stock in the three corporations, Express, Cartage and W. & H., and was general manager of them, while Hart owned the other forty per cent of the stock.

Walker died before the trial began and his wife, Mrs. Vernie Walker, Independent Executrix of his estate, was substituted as a party in his place. The suit was filed September 5, 1958. The issue of specific performance was severed from the issue of damages and the cause was tried on June 24, 1963, before a jury on the former issue only. The jury did not answer the first two special issues submitted, and answered the remaining special issues generally favorable to Walker.[1] Issue No. 1 related to whether the instruments contained all the agreements, and Issue No. 2, whether the instruments were executed and unconditionally delivered to the respective parties on June 30, 1956. Walker contended that they were delivered upon the condition that the notes were to be secured "to his satisfaction."

The trial court granted a motion for judgment non obstante veredicto on behalf of Central and Callan, awarding them specific performance of the contract, and Mrs. Walker has prosecuted this appeal. Hart did not appeal and is an appellee herein.

It will be noticed that there was a period of seven years between the making of the contract and the trial of this case. What happened during that period is important. By the terms of the contract Central agreed to purchase the stock of "Express", "Cartage" and "W. & H." for a total consideration of $2,000,000.00 for the stock in the three corporations, $1,200,000.00 of this to

---

1. On the other issues the jury found as follows:

No. 3: That Central was not all times ready, willing and endeavoring to carry out its obligation as provided in the contract.

No. 4: That Central is now ready, able and willing to carry out its obligation as provided in the contract.

No. 5: That Central did not use due diligence in securing the approval of the I.C.C. of the contract.

No. 6: That Walker did not fail to cooperate in obtaining the approval of I.C.C. of the contract.

No. 7: That the acts and conduct of Walker did not contribute to cause the delay in securing the approval of I.C.C. of the contract.

No. 8: That Walker did not at all times after October, 1956, repudiate his obligation to accept the unsecured notes of Central, as provided in the contract.

No. 9: That Callan is now and at all times material hereto has been ready, able and willing to carry out his contractual obligation as provided in the assignment to purchase the stock of the W. & H. Investment Co.

No. 10: That the facts and circumstances do not show that the performance of the contract is necessary to fairly, justly and adequately protect the rights of Hart.

No. 11: That the facts and circumstances do not show that the performance of the contract is necessary to fairly and adequately protect the rights of Central.

go to Walker for his stock, and $800,000.00 to Hart for his stock. $500,000.00 of the total consideration was to be paid in cash, and the remaining $1,500,000.00 was to be in the form of long-term promissory notes to be executed and issued by Central; of which notes $900,000.00 was to go to Walker and $600,000.00 to Hart. What Walker was to receive can be broken down as follows:

| | | | | | | |
|---|---|---|---|---|---|---|
| For his | Express stock—Cash | $ 75,000.00 — | Note | $225,000.00 |
| " | " Cartage " | 75,000.00 — | | 225,000.00 |
| " | " W. & H. " | 150,000.00 — | | 450,000.00 |
| | | $300,000.00 | | $900,000.00 |

The document concerning Express provides in Paragraph 3 thereof, as follows:

"It is agreed that this contract shall be immediately submitted to the Interstate Commerce Commission for approval, and all parties agree to cooperate and to use due diligence to secure said approval, and that this contract is subject to such approval. In the event that this contract is approved only in part or in the event any restriction is placed thereon by the Interstate Commerce Commission, the Buyer, at its option may consummate this contract or may declare the same void."

The document pertaining to Cartage and W. & H., each provided in paragraph 3 thereof, as follows:

"It is agreed and understood that this contract is contingent upon the consummation of that certain contract entered into by and between Central Freight Lines, Inc. and the Sellers herein dated June 30, 1956, for the sale to said Central Freight Lines, Inc., of the capital stock of Alamo Express, Inc., and if for any reason that said contract is not consummated, this contract shall be null and void."

Central is and, at all times material, was a carrier and subject to the provisions of the Federal Interstate Commerce Act, it is therefore clear that this contract could not be consummated without permission of the Interstate Commerce Commission, hereinafter referred to as I.C.C.

In keeping with the provisions of paragraph 3 of the Express contract, Central filed a petition to the I.C.C. for approval and authority to consummate the contract on June 30, 1956. A hearing was had before an examiner for I.C.C. on October 17, 1956. All parties to the contract appeared except Walker. The petition was opposed by Brown Express, Red Arrow Freight Lines and Union Truck Lines (who were connecting carriers with Express). After the hearing the Examiner made his report recommending that Central be given the permission sought, but on August 6, 1957, the I.C.C. denied the permission upon the ground that the issuance of $1,500,000.00 unsecured notes would result in over-capitalization of the business. Soon after the order was made, Walker wrote a letter to Callan, president and principal stockholder of Central, and to Central, stating that he wanted to abide by this decision, and that he would not agree to the filing of any motion for a rehearing. A few days later he sent a telegram to I.C.C., stating that he was not consenting to the filing of a motion for a rehearing and that no application of any kind should be considered that was not signed by him. Central and Callan obtained an extension of time for filing a motion for a reconsideration and timely filed the same, but based upon the assignment of the W. & H. contract to Callan. On September 4, 1957, Central executed an assignment of the W. & H. contract to Callan, who assumed the obligation of Central.

On January 22, 1959, I.C.C. made a new order wherein it undertook to eliminate

the purchase by Central of the W. & H. stock and to approve issuance by Central, on conditions therein stated, of only $750,000.00 in notes needed for the purchase by Central of Express and Cartage stock, and there was no authority granted for Central to issue an additional $750,000.00 in notes needed for the purchase by Central of the W. & H. stock. On the contrary, said order required as a condition that the W. & H. purchase be accomplished by new direct contract between Callan and Walker with the result that Central would not have to issue any notes in any amount in connection therewith.

Thereafter, on February 26, 1959, Central and Callan filed a petition for modification of the order of January 22, 1959, which was granted by an order of I.C.C. on June 4, 1959, reading as follows:

"It is ordered, that the said report and order of January 22, 1959, be and they are hereby, modified by substituting in lieu of the above described condition: (1) That W. W. Callan shall furnish a bond or other security approved by the Commission in an amount and form which will insure his financial responsibility under the assignment of September 4, 1957, of the contract of June 30, 1956, for the purchase by Central Freight Lines, Inc., of the capital stock of W. & H. Investment Company. * * *

"And it is further ordered, that, as expressly modified hereby, the said order of January 22, 1959, shall be effective on July 13, 1959."

Even after this modification Central had not been given permission to issue the $1,500,000.00 in unsecured notes it needed to consummate the original contract, $900,000.00 of which would go to Walker and $600,000.00 to Hart.

On August 8, 1960, Walker filed a special statutory civil action, being Civil Action 2364 in the U. S. District Court, for the purpose, among other things, of testing the validity of I.C.C.'s order of June 4, 1959. This case came on for trial on October 7, 1961, and when it became apparent that I.C.C. had not authorized Central to issue the necessary notes to carry out the original contract, or at least the matter was left in doubt, the "Three Judge Federal Court" before which the matter was being heard, on February 19, 1962, remanded the cause temporarily so that I.C.C. might clear up this matter.

On November 3, 1961, Central and Callan filed a new petition with I.C.C., seeking authority to issue the $1,500,000.00 in promissory notes to enable Central to consummate the original contract of June 30, 1956. On February 19, 1962, I.C.C. authorized Central to execute, issue and deliver notes as required by the original contract, provided Callan would immediately purchase notes in the sum of $750,000.00. These notes would be payable to Walker and Hart, and they would be the ones to determine whether such notes were for sale, and at what price. Neither Central nor Callan had sought such authority from I.C.C. at any time between August 6, 1957 and Nov. 3, 1961.

Thereafter, on September 11, 1962, the "Three Judge Court" rendered judgment upholding the orders of I.C.C., which action was affirmed by the Supreme Court of the U. S. on March 16, 1963. Walker v. United States, D.C., 208 F.Supp. 388; 372 U.S. 526, 83 S.Ct. 887, 9 L.Ed. 965.

■ The I.C.C. does not pass upon the private right of the parties to a contract but simply grants or withholds permission for the carrying out of such contracts.

Let us return now to a consideration of what was happening in the State Courts. On September 5, 1958, Walker had filed this suit seeking to terminate or rescind the contract which forms the basis of this litigation. On October 15, 1960, appellant (Walker), who had instituted the suit and who had answered defendants' cross-action and had appeared at hearings on excep-

tions, filed a petition for removal to the U. S. District Court for the Western District of Texas, San Antonio Division, being Civil Action No. 2893. This suit was later remanded to the State Court.

On October 15, 1960, in Civil Action No. 2364, in the U. S. District Court, Walker obtained an order temporarily restraining the Judge of the 131st District Court of Bexar County from proceeding with the trial. Walker later obtained an order from the U. S. District Court temporarily restraining Central and Callan from proceeding with the prosecution of their cross-action. The case at bar finally went to trial on June 24, 1963.

One of the all-important questions here presented is whether or not appellees committed an anticipatory breach of the original contract by assigning the contract as to W. & H. to Callan, so as to render the contract unenforceable as against Walker. Walker contends that after the order of I.C.C. on August 6, 1957, Central repudiated the contract and committed an anticipatory breach and Walker became entitled to terminate the contract.

The contract was executed on June 30, 1956. The petition to the I.C.C. for approval and authority to consummate the contract was filed July 10, 1956, which was within a reasonable time under the circumstances. On August 6, 1957, I.C.C. entered an order refusing permission to consummate the contract on the ground that the execution of the notes in the total sum of $1,500,000.00 by Central would result in over-capitalization of the business. Thereafter, Central assigned that part of the contract relating to W. & H. to Callan and filed a motion for a reconsideration with the I.C.C., seeking approval not of the original contract but of a new contract wherein Callan would sign the notes to the extent of $450,000.00. Central did not ask I.C.C. to reconsider its holding that for Central to sign notes in the total amount of $1,500,000.00 would result in over-capitalization of that business, and that holding still stands. The I.C.C. on January 22, 1959, conditionally approved the request of Central and Callan, that Callan be permitted, as assignee of the contract with W. & H., to sign the notes relating to this part of the contract, provided, in effect, that such arrangement would be agreeable to Walker. This arrangement fell through because Walker would not agree to accept notes signed by Callan in place of those signed by Central. Not until November 3, 1961, did Central and Callan file a new petition with I.C.C., under a new number, seeking permission for Central to sign the notes for the purchase of the W. & H. stock, which was granted by I.C.C. on February 19, 1962. Thus, for more than four years Central had abandoned the original contract and had been seeking permission from I.C.C. to consummate a new and different contract. It is unreasonable to presume that Central expected to sign and remain responsible to Walker and Hart on notes in the sum of $1,500,000.00 even though I.C.C. had flatly denied Central permission to sign such notes on the ground it would amount to an over-capitalization of the business, a holding in which Central acquiesced by not challenging such holding in its motion for a reconsideration before the I.C.C., but only requesting the approval of a new and modified plan. Thus, for a period of over four years, Central made no attempt to secure permission from I.C.C. to consummate the original contract but was offering a modified plan. Under such circumstances Walker was entitled to repudiate the original contract and to refuse to be further bound by it. Western Oil Sales Corp. v. Bliss & Wetherbee, Tex.Civ.App., 299 S.W. 637; Galbreath v. Reeves, 82 Tex. 357, 18 S.W. 696. An obligation which calls for a personal obligation, such as the signing of an unsecured note, cannot be assigned without the consent of the payee of such note. 49 Am.Jur. p. 173, § 150; Anno. 138 A.L.R. p. 219. It is true that during the delay Walker filed one lawsuit seeking to rescind and cancel the contract, and another challenging the order of the I.C.C., but

this would not excuse Central for its lack of diligence. Corzelius v. Oliver, 148 Tex. 76, 220 S.W.2d 632; Witte v. Barry, Tex. Civ.App., 16 S.W.2d 548.

■ The jury found and the record supports the findings that Central had not at all times been ready, willing and endeavoring to carry out its obligations and had not exercised due diligence to secure the approval of I.C.C., as provided in the contract of June 30, 1956, and therefore Central was not entitled to the equitable remedy of specific performance. Ratcliffe v. Mahres, Tex.Civ.App., 122 S.W.2d 718, writ refused; 38 Tex.Jur. 711, § 42; 138 A.L.R. p. 217. By reason of the nature of the subject matter and the provisions of the contract, great diligence was required in executing the contract. It is true that no time was fixed within which the contract was to be performed, but where none is specified, a reasonable time is intended. English v. Underwood, Tex.Civ.App., 5 S.W.2d 1033; Abernathy v. Florence, 51 Tex.Civ.App. 573, 113 S.W. 161. Central, by submitting the modified plan, waited an unreasonable length of time to consummate this contract and is not now entitled to the equitable remedy of specific performance. I.C.C. in making its final order stated that the reason it was not sooner granted was that Central and Callan had not asked for it.

■ A party is not entitled to the equitable remedy of specific performance unless he shows that he has diligently and timely performed or complied with all of his obligations, and this is true though the other party has stated he will not carry out the contract. Corzelius v. Oliver, supra; Witte v. Barry, supra; Terrell, Atkins & Harvin v. Proctor, Tex.Civ.App., 172 S.W. 996; Brown v. Binz, Tex.Civ.App., 50 S.W. 483.

In view of the above holdings, we do not deem it necessary to pass upon other points presented by the parties.

The judgment, insofar as it grants specific performance against Walker, is re-versed and judgment here rendered that Central and Callan take nothing as against Walker.

Louis E. Hart, Sr., having prosecuted no appeal, the judgment as to him is affirmed.