W. W. McMILLAN et al., Petitioners,

v.

R. E. SMITH et al., Respondents.

No. A–8888.

Supreme Court of Texas.

Nov. 14, 1962.

Rehearing Denied Jan. 23, 1963.

Bell & Singleton, Houston (Otto Yelton, Houston, of firm), for petitioners.

Hofheinz, Sears, James & Burns, Houston, for respondents.

GREENHILL, Justice.

This is a suit for specific performance of a written contract for the sale of the McMillan Ranch in Brazoria County, Texas. The suit was brought by the purchasers, R. E. Smith and Roy Hofheinz of Harris County. The sellers, W. W. McMillan, Arthur Mandell, and Herman Wright, filed a cross action for rescission of the contract. The major issues are whether the buyers made a sufficient tender of the purchase price; and if they did not, whether such failure precluded them from obtaining specific performance. A determination of those issues requires a construction of the contract, particularly as to the necessity for the payment for an alleged vacancy of approximately 36 acres within the area.

Trial was to the court sitting without a jury. At the conclusion of the buyers' (plaintiffs') evidence, both parties rested. The sellers moved for judgment upon the basis that the undisputed evidence showed an inadequate tender by purchasers. The trial court entered a take-nothing judgment against the buyers and declared the contract null and void.

A majority of the Court of Civil Appeals reversed the judgment of the trial court and remanded the cause for a new trial. 352 S.W.2d 872. The "majority opinion" is by Justice Werlein. The concurring opinion by Justice Coleman agrees with that of Justice Werlein only as to the result reached: that of reversal and remand. Otherwise he disagreed with Justice Werlein on major issues. Chief Justice Bell, in dissent, agreed with Justice Werlein in many respects, but he would have affirmed the judgment of the trial court because of what he regarded as an insufficient tender by the buyers. Both buyers and sellers applied to this Court for writ of error.

Under the contract of sale dated August 24, 1959, the sellers agreed to furnish an abstract of title showing good and merchantable title to the ranch. Upon examination of the abstract submitted, buyers' attorney listed twenty-five objections to ti-

tle, many of which were removed by sellers. In February of 1960, sellers advised buyers of their refusal to take action on several objections and their (sellers') inability to clear others. Sellers were thus in default on the contract. Thereafter buyers repeated their request for removal of these defects on several occasions and finally gave sellers written notice on February 29, 1960, of their election to take title subject to unsatisfied objections as authorized under the contract.

In this letter of February 29, buyers demanded that sellers execute a deed which conveyed the entire ranch, with the exception of certain outstanding royalty and mineral interests. This deed, which was drafted by buyers' attorney, included a general warranty to all land conveyed, but excepted from the warranty all claims arising under certain canal and county road easements. Pursuant to the agreement, the purchasers agreed to assume an indebtedness of $152,-874.43 which was secured by a deed of trust lien on the property. It was in this same letter that buyers made their tender of $525,000, less deductions for the debt assumed, survey costs, filing fees, Federal documentary stamp tax, and the "reasonable cost and expense of curing and clearing title." The last deduction of $27,898.12 is the focal point of the controversy and is the foundation of sellers' position that buyers failed to make an adequate tender of purchase price as a condition precedent to specific performance.

As will be later set out, the contract provided that if the sellers did not own 1,184 acres, or if it should be determined that the over-all parcel of land, after survey, should contain less than 1,184 acres, the consideration to be paid would be adjusted at the rate of $443.42 per acre, or this amount would be added per acre for land in excess of 1,184 acres.

The buyers' deduction of $27,898.12 as the "reasonable cost and expense of curing and clearing title" was detailed as follows:

(a) $1,500.00: this charge was buyers' estimate of the reasonable cost and expense for procuring two quitclaim deeds from the Sharp and Sandidge interests and for obtaining a certificate of succession of ownership from a school district. The amount included anticipated attorneys fees, court costs and miscellaneous legal costs "since suit in trespass may be necessary."

(b) $16,093.04: this amount was asserted to be the reasonable cost of acquiring title to a vacancy existing within the ranch. Buyers claimed that a survey of the ground and an examination of the abstract both revealed a 36.293-acre vacancy of unpatented school land to which sellers owned no title. For this failure of title, buyers deducted $443.42 per acre pursuant to a provision in the contract referred to above. They nevertheless demanded a general warranty deed to all the land including the area in the vacancy.

(c) $10,305.08: this amount was buyers' calculation of the cost of removing three easements which prevented sellers' title from being good and merchantable. The survey of the property had established that the total gross acreage of 1202.825 acres included easements of 18.76 acres in the Houston Lighting and Power Company (which easement was unrecorded); 4.28 acres in the Dow Chemical. Company; and .20 acre in the Trunkline Gas Company. Approximately 5 acres of the power company easement was across the alleged vacancy. Buyers' position was that sellers had made no attempt to get the easements removed; and that by negotiations with the holders of the easements, it was possible to get them removed. In buyers' letter of February 29, 1960, they stated that they did not know what it would take to get the easements removed. But buyers estimated that it would be at least $443.42 per acre. So buyers demanded a general warranty deed to the land which was subject to the easement but deducted $443.42 per acre from the purchase price for such land. An 18-acre county road easement and an 11-acre canal easement are not in issue here.

Following buyers' final demand and tender, the sellers, in a letter dated March 18, 1960, refused to execute the deed demanded of them, asserting that the $27,-898.12 deduction was unauthorized and that the tendered purchase price was therefore insufficient. In the same letter, sellers stated that they were rescinding the contract by reason of buyers' insufficient tender. At all times, buyers insisted that each of the disputed deductions set out above was expressly authorized under the contract of sale.

Upon the trial of the case, the purchasers pleaded that they were ready, willing and able to carry out the contract. They offered to do complete equity as between the parties, and deposited $336,038.10 in the court, the amount they regarded as owing. They further pleaded that "in the event the Court * * * determines that any further sum is due to Defendants under the sale agreement, Plaintiffs stand ready, willing and able and here and now offer to deposit such further sum in court or pay the same to the Defendants, as the Court may order." There is no question as to the solvency of the purchasers.

The controlling parts of the agreement read as follows:

"1. Subject to the following terms, conditions, and stipulations Sellers have agreed to sell and Purchasers have agreed to buy all of the following described tracts or parcels of land lying and being situated in the County of Brazoria, State of Texas:

"All of the property owned or claimed by the Sellers in Section 76 [and other sections adjacent thereto].

"2. The Sellers will convey the surface to all of such lands by general warranty deed to the Purchasers * * * [The mineral estate was also to be conveyed by general warranty deed, subject to any outstanding royalty and mineral interests shown of record]

\*     \*     \*     \*     \*     \*

"4. The overall consideration of $525,000.00 is subject to the agreement and understanding of the parties that 1,184 surface acres are contained within the overall parcels of lands to be conveyed under this agreement. Should it be determined upon examination of abstracts of title that the Sellers do not own 1,184 surface acres, or should it be determined that the overall parcel of lands actually contains less than 1,184 acres or more than 1,184 acres by survey upon the ground, conducted by a Licensed State Land Surveyor selected by the Purchasers, at Sellers' cost, the final cash consideration to be paid shall be adjusted at the rate of $443.42 per acre, such sum to be deducted for acreage short of 1,184 acres, or added for acres in excess of 1,184 acres. Provided, that if either examination of title or survey reveals that the over-all parcel of lands contains less than 1,000 acres, Purchasers shall be entitled to cancel this contract and have the earnest money returned to them.

\*     \*     \*     \*     \*     \*

"6. Sellers agree to furnish the Purchasers an abstract of title covering the above described lands from the sovereignty of the soil to a current date, which abstract shall be furnished without delay and within a reasonable time from and after the date of this agreement, and which abstract of title, upon examination, will show a good and merchantable title in the Sellers as represented in Paragraph 2 hereof, to the satisfaction of Purchasers' attorneys. Within a reasonable time after delivery of such abstracts, Purchasers will either accept the title as good and merchantable as herein set out, or will furnish to the sellers the written title opinion of Purchasers' attorneys, stating objections to the title, whereupon Sellers shall have a reasonable time to clear the objections, at Sellers' sole cost and expense, and show a good and mer-

·chantable title as aforesaid. In the event of the failure of the Sellers to furnish a good and merchantable title satisfactory to Purchasers' attorneys, the Escrow Agent shall upon Purchas-·ers' demand, return to Purchasers the $25,000.00 earnest money whereupon this contract shall be cancelled; or Purchasers may enforce specific per-formance of this contract; or, in the ·event of Sellers' failure to meet and ·cure objections to the title Purchasers may demand and take title subject to such objections and shall be thereupon entitled to charge the Sellers and re-cover from them the reasonable cost and expense of curing and perfecting the title so acquired.

"7. Not later than thirty (30) days from and after the delivery of all cura-tive instruments necessary to show a good and merchantable title to the sat-isfaction of Purchasers' attorneys, or thirty (30) days after acceptance by Purchasers' attorneys of the title as ·shown in the abstract as good and mer-·chantable, the Sellers agree to deliver a good and sufficient General Warranty Deed (subject to the exceptions set out above) in form satisfactory to the Pur-chasers properly conveying the lands herein contracted to the Purchasers; and upon the delivery of such deed, Purchasers agree to pay the considera-tion by assumption and cash payment as set out above. At the time of such closing, the Sellers will be charged with their prorated portion of taxes for the year 1959, with the cost of Federal rev-enue stamps, and with abstract and title costs (including the cost of curing title)."

As will be set out below, the tender of buyers was not the precise sum due under the contract. The controversial deductions will be discussed in order. The effect of this tender in view of other circumstances and purchasers' tender in the trial court will be discussed later herein.

▪ Neither paragraph 6 nor paragraph 7 of the contract authorizes buyers to deduct for attorneys fees and court costs which have not yet been incurred. The last sen-tence of paragraph 6, entitling buyers "thereupon * * * to charge the Sellers and recover from them the reasonable cost and expense of curing and perfecting the title so acquired," cannot be so construed. Buyers purport to deduct for costs which might or might not be incurred in acquir-ing the quitclaim deeds and transfer certifi-cates in question. Suit may or may not be necessary to cure title. Even assuming that the contract did permit deductions of such costs as were reasonably anticipated, the clause would nevertheless be unenforce-able because the projected costs are too speculative at this time. Guesswork would underlie any estimation of such costs wheth-er it be made by buyers' attorney or by the courts. The cost of the curative work and possible litigation involved here simply does not lend itself to forecast with certainty under the facts before the Court.

▪ We agree with the majority of the Court of Civil Appeals that Paragraph 7 does not authorize the $1,500.00 deduction for attorneys fees. The provision under which buyers may charge sellers with "ab-stract and title costs (including the cost of curing title)," refers to actual costs ex-pended by either party up to the time of closing. The entire paragraph deals with closing deductions in the event seller trans-fers good and merchantable title and all defects have been cured. If the buyers elected to take the title in a defective con-dition, as they did, they may, under the con-tract, recover the cost of clearing title. But they may not deduct a sum in advance under the contract as we construe it.

▪ We turn now to the deduction made by purchasers of $16,093.14 from their tender because of the alleged vacancy. The figure represents 36.293 acres said to be in the vacancy at $443.42 per acre. Sellers made no effort to cure this title objection.

Under the contract of sale as we interpret it, buyers had several choices:

1. They could exclude the 36.293 acres from the deed and abate the purchase price at $443.42 per acre.

2. Since sellers failed to show good and merchantable title, buyers could have demanded the return of the $25,000 earnest money and cancelled the contract.

3. They could specifically enforce the contract as to all land owned or claimed by sellers (which would include the vacancy) subject to the title defects, with a right of recovery from sellers of the reasonable cost of curing and perfecting title, and look to sellers on their general warranty on the entire title.

■ Buyers elected the third alternative: to take the land subject to the title defects. They tendered a general warranty deed to the entire acreage, including the vacancy, and demanded its execution. At the same time they tendered the cash for the purchase which excluded $443.42 per acre for the vacancy. Under the agreement as we construe it, they cannot do both of these things.

■ Counsel for buyers argue that under the contract and the third alternative that they are "thereupon" entitled to deduct the cost of curing and perfecting title which they estimate to be $443.42 per acre, and for *that* reason they made the correct tender. As we have indicated above, we are unable to agree with this construction. When the reasonable cost of such curative work has been established, it may be recovered; and buyers have a right on their warranty.

It is also argued that buyers should recover for the failure of title to the vacancy in this suit and not have to pay their money and then bring another suit later after they have done all the work sellers were supposed to do. Williston suggests that a suit for damages for breach of warranty may be combined with a suit for specific perform-

ance to dispose of the two rights of the purchaser in one suit. 5 Williston, Contracts (Rev. ed.) 4016, § 1436. However, no such claim was pleaded or presented in this case.

■ We think the same reasoning applies to the acreage over which there were easements. Having elected to take the acreage subject to its defects and having demanded a general warranty deed to the land, buyers must look to their rights to recover their reasonable costs of curing title or to recovery on their warranty if the defects cannot be cured.

■ Having thus held that the tender of purchasers was not of the precise amount due, we turn to the question whether this failure prevents the granting of specific performance. Two additional factors are present here: as indicated above, sellers were in default when the tender was made (they had failed to show good title and had failed and refused to attempt to cure certain defects); and the purchasers had made a tender in court of $336,038.10 and had offered to put up such additional sum as the court might direct. We regard this as an offer to do equity and an adequate tender in court.

■ There is a well-recognized exception to the rule that a purchaser, to obtain specific performance, must have made a correct tender to the seller. Historically, in a suit for specific performance, the question as to the necessity for a tender of performance by a purchaser has been determined according to equitable rules rather than to those applicable to an action at law. The latter requires the purchaser, as a condition precedent, to tender performance. Courts of equity, on the other hand, have not been bound by strict and inflexible rules. This problem is the subject of an annotation in 79 A.L.R. 1240. It is there concluded that,

"Hence if, because of defects in the vendor's title, which he fails or refuses to cure, * * * a tender of performance by the vendee would be a useless act * * *, his failure to make such

tender will not preclude in his behalf the equitable relief of specific performance, at least where he tenders performance in his bill or petition."

Support for this rule is also found in 4 Pomeroy, Equity Jurisprudence, 1051, § 1407a; 5 Corbin, Contracts (1951), 769, § 1175; and 49 American Jurisprudence 166-167, Specific Performance §§ 143–144. We think the substance of this rule was adopted by this Court in Burford v. Pounders, 145 Tex. 460, 199 S.W.2d 141 (1947).

■ The particular contract in question, though drawn by able counsel for the purchasers, is difficult to construe. The three opinions of the Court of Civil Appeals attest to this fact. The sellers were in default prior to the purchasers' tender. Their default, the negotiations in evidence prior to the tender, the many flaws in sellers' title, and the objections to these defects made it even more difficult to arrive at a precise amount which the courts would say was due under the contract. The purchasers tendered the amount which they believed to be due. In their pleadings in the trial court, the purchasers said, in substance: we have tendered what we, in good faith, consider to be due; if we owe any more, we herewith make a full tender of whatever the court finds to be due. Under these circumstances, the trial court was in a position to protect fully the rights of both the purchasers and the sellers. And under these circumstances, our holding is that the failure to make a tender of the amount actually due does not preclude a court of equity from specifically enforcing the contract. For the same reasons, the sellers are not entitled to rescission of the contract of sale. Armstrong v. Ross, 61 W.Va. 38, 55 S.E. 895, 899 (1906).

The "majority" opinion reversed the judgment and remanded the cause for a new trial because of the exclusion of certain evidence. Included in that category was evidence tendered by purchasers of the existence of the vacancy; evidence of purchasers' attorney which gave his reasons

for believing, in good faith, that the title was defective; and a letter written by sellers immediately after buyers' letter of tender which related to a waiver by sellers of buyers' insufficient tender. In view of the holdings of this opinion, we see no purpose in remanding the case generally for a new trial. In so far as we have been able to determine, none of these matters would be decisive. Our decision has assumed the existence of the vacancy, the good faith objections of counsel to the sellers' title, and the insufficiency of purchasers' original tender. So these errors, if any, become harmless.

■ The tender in the trial court included the assumption of the indebtedness of $152,874.43, about which there is no question, and cash in the amount of $336,038.10. In addition, purchasers tendered such additional amounts as might be found to be due. That would include the $27,898.12 which buyers had deducted and which this Court directs be paid into court as a condition precedent to the specific performance demanded by buyers. Upon fulfillment of this requirement, buyers are entitled to execution of the deed which they submitted to sellers on February 29, 1960.

This action by purchasers will not prejudice purchasers' right to recover, under the contract, the reasonable cost of curing the title to the property or their rights under sellers' covenant of general warranty. Implicit in this holding is the right of purchasers to any after-acquired title which sellers might obtain to the property in question.

In so far as judgment of the Court of Civil Appeals reverses that of the trial court, it is affirmed. In so far as the judgment of the Court of Civil Appeals remands the cause to the trial court for a new trial, it is set aside, and the cause is remanded to the trial court with instructions that if within 30 days from the day on which the opinion of this Court becomes final, the purchasers shall pay into the registry of the

trial court the sum of $363,936.22 due to sellers under the contract, the purchasers shall be entitled to specific performance. Otherwise, judgment shall be entered for sellers.