James and Patricia **CHAPMAN,**
Appellants,

v.

Doug and Eleanor **OLBRICH,**
Appellees.

No. 14–05–00056–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 29, 2006.

Supplemental Opinion Overruling
Rehearing Nov. 16, 2006.

Rehearing Overruled Feb. 1, 2007.

ed with, and properly defensive of affirmative claim).

George W. Dana, Houston, for appellants.

C. Charles Dipple, Frederick D. Junkin, J. Mark Breeding, Houston, for appellees.

Panel consists of Justices HUDSON, FROST, and SEYMORE.

## MAJORITY OPINION

KEM THOMPSON FROST, Justice.

Appellants James and Patricia Chapman, sellers under a real estate sales contract, appeal the trial court's judgment in favor of the buyers, appellees Doug and Eleanor Olbrich. Based on a unanimous jury's findings, the trial court exercised its equitable powers to award the Olbrichs specific performance on their contract to purchase real property from the Chapmans. The main issue on appeal is whether there is legally sufficient evidence to support an award of specific performance to the Olbrichs. We conclude that there is legally sufficient evidence to support the trial court's grant of specific performance. Because the Chapmans' other issues lack merit, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Chapmans owned three lots in the Timberlakes Estate subdivision. In 1999, the Olbrichs purchased a lot adjacent to the Chapmans' property. On Easter Sunday of 2002, the Olbrichs learned the Chapmans were interested in selling their property and moving elsewhere.

On April 3, 2002, the Olbrichs, interested in purchasing one of the Chapmans' three lots, wrote the Chapmans a letter offering to purchase Lot 21 for $20,000 cash. The Chapmans stated that they had *no immediate plans to do anything other than keep the lot vacant.* After the Chapmans expressed interest in selling Lot 21,

Mr. Olbrich drew up an earnest money contract. Both parties signed this contract, and the Olbrichs deposited $1,000 as earnest money with the North American Title Company.

On May 3, 2002, the Olbrichs had a survey done on Lot 21 and on their own property. The survey revealed that the boundary line for Lot 21 went through the swimming pool on the Chapmans' property. On May 5, 2002, Mr. Olbrich notified Mrs. Chapman of this discovery. Mr. Olbrich testified that at this point Mrs. Chapman indicated that she intended to remove the swimming pool, which was overgrown with wisteria and lily pads, because it was an eyesore inhibiting the sale of the Chapmans' house.

When Mrs. Chapman told Mr. Olbrich that it would be very expensive to remove the pool, he suggested that she remove the pool's top coping, punch holes in its bottom to prevent buoyancy if rain water soaked into the ground, and fill the pool with dirt.[1] Mrs. Chapman responded that she would deal with the pool but did not know how long it would take. Although the closing was set for May 25, Mr. Olbrich suggested they extend the closing date to give the Chapmans time to resolve the pool issue. Mr. Olbrich drew up an addendum (dated May 14, 2002) to the contract, extending the closing date to June 9, 2002.

On Friday, June 7, Mr. Olbrich approached Mrs. Chapman and suggested that they close that same afternoon. Mrs. Chapman responded that she needed more time to finish the pool project, to which Mr. Olbrich replied that she could have all the time she needed. Mr. Olbrich observed workers with backhoes and large equipment working on the pool until June

---

1. Unbeknownst to the Olbrichs, Mrs. Chapman already had received an estimate that it would cost $10,000 to remove the pool deck and the top eighteen inches of the pool and fill the pool with dirt.

23, 2002, after which he saw nobody at the Chapmans' house. Mr. Olbrich tried to call the Chapmans, but no one answered.

In the meantime, Mrs. Chapman contracted to sell all three lots to Jorge and Yuwandee Medrano. Mr. Medrano testified that he became familiar with the property in June 2002, when he visited a neighbor of the Chapmans. Mr. Medrano did not go into the Chapmans' home, but he talked to Mrs. Chapman, who was outside mowing the yard. Mr. Medrano testified that Mrs. Chapman informed him she could not sell him the house until after July 1, 2002. On July 2, 2002, Mr. Medrano returned with his wife to look at the property and thereafter entered into a contract to buy all three lots from the Chapmans.

On July 15, Mr. Olbrich spoke to Mrs. Chapman. Unaware of the Chapmans' intention to sell the property to someone else, Mr. Olbrich inquired about the progress on the pool. Mrs. Chapman informed Mr. Olbrich that "[t]he contract is over" and that the Chapmans had contracted to sell the property to somebody else.

Mr. Olbrich immediately called his attorney and then wrote to the title company, stating that the Olbrichs intended to enforce their contract by specific performance:

> Pursuant to the Contract of Sale between James and Patricia Chapman, the Sellers, and Doug and Eleanor Olbrich, the Buyers, for Lot 21, Block 8, Section 1, Timberlake Estates, Harris County, Texas, the Property, dated April 19, 2002, and Addendum No. 1, dated May 1, 2002, the Sellers have failed to comply with the contract as agreed and are in default.
>
> As provided under Section 15, DEFAULT, (a) "the Buyer may enforce specific performance, seek such other relief as may be provided by law, or both". [sic] Buyer intends to enforce specific performance of the contract and wishes to proceed with immediate closing.

The Olbrichs sent the Chapmans a copy of this letter.

The next day, July 16, 2002, the Olbrichs wrote the Chapmans, informing them that they were claiming specific performance and demanding an immediate closing, after which the Olbrichs would contract for the removal of the swimming pool "with reimbursement to [the Olbrichs] of associated expenses and any attorney fees." The Olbrichs offered to meet with the Chapmans for mediation within two days; after that time, the Olbrichs planned to file a lis pendens on the property.

The Olbrichs received no reply to the July 15 and 16 letters. On July 20, 2002, Mrs. Olbrich wrote Mrs. Chapman and offered to purchase Lot 21, reduced in size by 3,325 square feet so that the swimming pool would be entirely located on the Chapmans' property, for the original $20,000 purchase price. The Chapmans failed to respond to the July 20 offer.

On July 22, 2002, the Olbrichs sued the Chapmans for breach of contract, seeking specific performance and attorney's fees. In their petition, the Olbrichs stated that they "here [sic] tender their performance and undertake to do such things and pay such amounts as required by the contract, the law, and the orders of this Court. They offer to do equity." On July 26, 2002, the Olbrichs filed a notice of lis pendens on the property.

The Chapmans filed a counterclaim in which they sought a declaratory judgment that the contract was terminated or expired on or before June 9, 2002. They also sought attorney's fees.

The Chapmans and the Medranos closed on the sale of the Chapmans' property on

August 8 or 9, 2002.[2] At the time of trial, the Medranos still owned, and were living on, the property they purchased from the Chapmans.

The jury found that the Chapmans had failed to comply with their agreement to sell Lot 21 to the Olbrichs and that their failure to comply was not excused. The jury awarded attorney's fees totaling $55,000 for trial and appeals.

In its final judgment, the trial court awarded the Olbrichs specific performance and ordered that Lot 21 be vested in the Olbrichs and "divested from any person claiming the same since July 1, 2002, including the Defendants, James and Patricia Chapman, and their purchasers of Lot 21 ... Jorge S. and Yuwadee S. Medrano." The trial court also ordered the Chapmans to sign a release of escrow to North American Title Company in favor of the Olbrichs for release of their $1,000 earnest money. The trial court further ordered that the $20,000 purchase price of Lot 21 be applied to the Olbrichs' award of attorney's fees and that the Olbrichs recover the remaining $35,000 from the Chapmans, with the amounts for appeals credited if no appeal were filed in the court of appeals or the Texas Supreme Court.

## II. ISSUES PRESENTED

In their issues on appeal, the Chapmans assert the trial court erred as follows:

(1)-(2) in denying the Chapmans' motions for directed verdict and for judgment notwithstanding the verdict and in awarding the Olbrichs specific performance because the contract allegedly terminated in accordance with its own terms when the Chapmans could not cure the pool encroachment revealed by the survey.

2. The Medrano/Chapman sales contract was originally taken to North American Title Company, the same title company that had the Olbrich/Chapman sales contract. North

(3)-(4) in denying the Chapmans' motions for directed verdict and judgment notwithstanding the verdict and in awarding the Olbrichs specific performance because the Olbrichs allegedly never tendered their own performance under the contract and, in fact, tendered only a nonconforming performance.

(5) in excluding from evidence the Olbrichs' response to the Chapmans' requests for disclosure.

(6) in offsetting the purchase price of Lot 21 against the attorney's fees awarded to the Olbrichs because the property allegedly was part of the Chapmans' homestead, making the sale proceeds from the property protected from creditors' claims.

## II. ANALYSIS

**A. Did the contract terminate in accordance with its own terms when the Chapmans failed to fix the pool encroachment revealed by the survey?**

In their first two issues, the Chapmans assert that the trial court erred in awarding the Olbrichs specific performance and in denying their own motions for directed verdict and for judgment notwithstanding the verdict on the basis that the contract terminated in accordance with its own terms.

At any course of trial proceedings, judgment without or against a jury verdict is proper only when the law does not allow reasonable jurors to decide otherwise. *City of Keller v. Wilson,* 168 S.W.3d 802, 823 (Tex.2005). The test for legal sufficiency is the same for directed verdicts and judgments notwithstanding the verdict. *Id.* When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *Id.* at 822. We credit favorable evidence if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. The evidence

American rejected the Medrano/Chapman contract, and so the Medranos and the Chapmans had to close at another title company.

is legally sufficient if it would enable fair-minded people to reach the verdict under review. *Id.*

In construing contracts, our primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 464 (Tex.1998). To ascertain the true intentions of the parties, we examine the entire contract in an effort to harmonize and give effect to all of its provisions so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.,* 995 S.W.2d 647, 652 (Tex.1999). When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and the court construes it as a matter of law. *American Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

The Chapmans contend that the contract terminated on June 9, 2002 in accordance with Paragraph 6.B. because the Olbrichs objected to the swimming-pool encumbrance revealed by the survey and the Chapmans failed to cure this defect within fifteen days of receiving the objection. Paragraph 6.B. of the contract states in full as follows:

B. SURVEY: (Check one box only)

■ (1) Within 5 days after the Buyer's receipt of a survey furnished to a third-party lender at □ Seller's ■ Buyer's expense, Buyer may object in writing to any matter shown on the survey which constitutes a defect or encumbrance to title.

□ (2) Within days after the effective date of this contract, Buyer may object in writing to any matter which constitutes a defect or encumbrance to title shown on a survey obtained by Buyer at Buyer's expense.

The survey must be made by a Registered Professional Land Surveyor acceptable to the Title Company and any lender. Utility easements created by the dedication deed and plat of the subdivision in which the Property is located will not be a basis for objection.

Buyer may object to existing building and zoning ordinances, items 6A(1) through (8) above and matters shown on the survey if Buyer determines that any such ordinance, items or matters prohibits the following use or activity:____NA____.

Buyer's failure to object under Paragraph 6A or 6B within the time allowed will constitute a waiver of Buyer's right to object; except that the requirements in Schedule C of the Commitment will not be deemed to have been waived. Seller shall cure the timely objections of Buyer or any third party lender within 15 days from the date Seller receives the objections and the Closing Date will be extended as necessary. If objections are not cured by the extended Closing Date, this contract will terminate and the earnest money will be refunded to Buyer *unless Buyer elects to waive the objections.*

(blanks in original, emphasis added). As indicated above by the shaded box, Paragraph 6B(1) applies to the facts of this case.

Within days after the Olbrichs' survey revealed that the boundary line for Lot 21 went through the swimming pool on the Chapmans' property, Mr. Olbrich presented the Chapmans with "Addendum No. 1" requesting that the Chapmans remove the encumbrance and extend the closing date from May 25, 2002 to June 9, 2002. They agreed. The Chapmans now maintain that this addendum constituted a written objection to the encumbrance (based on the survey) because it was delivered five days

after the date the survey was completed and extended the closing date fifteen days past the original closing date of May 25, 2002. Thus, the Chapmans argue that because the Olbrichs objected to the encumbrance and the Chapmans failed to cure the objections within fifteen days, the contract terminated in accordance with its own terms on June 9, 2002, extinguished all duties owed by either party, and precluded enforcement of the contract by specific performance.

The Olbrichs make two arguments in response. First, they contend that "Addendum No. 1" did not constitute an objection to a defect or encumbrance to title shown on a survey. Second, they contend that Paragraph 6.B does not apply because there was no third-party lender to furnish a survey to the Olbrichs (as the sale was a cash transaction), thus the Olbrichs did not have the power to object under Paragraph 6.B(1).[3]

█ We conclude that "Addendum No. 1" does not constitute an objection to a defect or encumbrance to title shown on the Olbrichs' survey. The Chapmans maintain that "Addendum No. 1" was a written objection to the pool encroachment because, consistent with the contract's provisions, it was presented exactly five days after the date the survey was signed and gave the Chapmans fifteen days to cure the objections.[4] The Chapmans then assert that because they were unable to remove the encumbrance (although they claim they attempted to remove it in good faith), the contract terminated on June 9, 2002. Accordingly, the Chapmans contend

that all duties under the contract were extinguished on this date, after which the Olbrichs had no contract upon which to base their specific performance action.

Whether "Addendum No. 1" was a written objection to the pool encroachment is a question of law. *See Sw. Intelecom, Inc. v. Hotel Networks,* 997 S.W.2d 322, 324 (Tex. App.-Austin 1999, pet. denied) (stating that the interpretation of a writing is a legal matter). To analyze the issue, we look first to the content of "Addendum No. 1," which states in its entirety:

> Addendum No. 1 to the Contract of Sale between James and Patricia Chapman, the Sellers, and Doug and Eleanor Olbrich, the Buyers, for Lot 21, Block 8, Section 1, Timberlake Estates, Harris County, Texas, the Property, dated April 19, 2002.
>
> Whereas the Survey, Item 6. *Title Policy and Survey,* furnished by the Buyers shows fencing and a swimming pool owned by the Sellers encroaching upon the Property, the Sellers agree to the following.
>
> The Sellers will remove the top coping and pool structure to a depth of at least one (1) foot beneath the existing land surface, puncture sufficient holes in the bottom of the swimming pool to prevent buoyancy, and compact the void created by the swimming pool with fill dirt to an elevation at least six (6) inches higher than the surrounding land surface. The fencing on the Property will be removed and retained by the Sellers.

---

**3.** The Olbrichs concede that paragraph 6.B(2) may have fit the facts of this case, but because this provision was not checked by the parties, we do not address it as a resolution to the issues raised by the Chapmans in this appeal.

**4.** The Chapmans also state the Olbrichs' responses to requests for disclosure of their

factual bases of their claims support the Chapmans' argument that "Addendum No. 1" was a written objection. The trial court excluded these discovery responses at trial. For disposition of this sub-issue, see the discussion of the Chapmans' fifth issue *infra.*

The Closing Date of May 25, 2002 is extended to June 9, 2002 or sooner to allow the Sellers time to remove fencing and abandon the swimming pool.

Executed on the 14 day [sic] of May, 2002.

The addendum was signed by both the Chapmans and the Olbrichs. However it is not necessarily an objection to a defect or encumbrance to title merely because it was executed five days after the survey's completion and extended the closing date fifteen days. The contract language states that the "Seller shall cure the timely objections of Buyer or any third party lender within 15 days from the date Seller receives the objections and the Closing Date will be extended as necessary." The addendum, however, extends the closing date to June 9, 2002, or sooner, to allow the sellers (the Chapmans) time to remove the fencing and abandon the swimming pool. The language in the addendum does not mirror the contract language. We conclude that "Addendum No. 1" is not an objection prompting application of Paragraph 6.B; rather, it is merely an addition to the parties' contract delineating the terms of a mutually acceptable solution to the pool and fence encroachments. Therefore, the trial court did not err in denying the Chapmans' motions for directed verdict and for judgment notwithstanding the verdict based on their argument that the contract terminated under Paragraph 6.B.

■ Furthermore, even if "Addendum No. 1" were an objection under Paragraph 6.B., the trial court still would not have erred in denying the Chapmans a directed verdict and judgment notwithstanding the verdict because Paragraph 6.B. states that it applies only to surveys furnished to a third-party lender.

When a written contract is so worded that it can be given a certain or definite legal meaning or interpretation, it is not ambiguous, and courts construe it as a matter of law. *American Mfrs. Mut. Ins. Co.*, 124 S.W.3d at 157. Neither party argues that the contract is ambiguous. The language of Paragraph 6.B unambiguously allows the Olbrichs to object to a defect or encumbrance to title shown on a survey furnished to a third-party lender at the buyers' expense, within five days of the Olbrichs' receipt thereof. The transaction between the Chapmans and the Olbrichs did not involve a third-party lender. Thus, Paragraph 6.B. does not apply. To accept the Chapmans' argument that "Addendum No. 1" was an objection under Paragraph 6.B. would require us to read the contract as though it provided the Olbrichs the option to object upon receipt of a survey other than the survey referenced in the contract. However, we interpret words in a contract according to their usual grammatical meaning, and construe the contract as written. *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex.1987). Under the contract's plain language, the Olbrichs could not have objected under Paragraph 6.B. and thus the "cure" language upon which the Chapmans rely is inapplicable.[5] *See MCI Telecomms. Corp.*, 995 S.W.2d at 652 (stating that "[w]e examine the entire agreement in an effort to harmonize and give effect to all of the provisions of the contract so that none will be rendered meaningless").

We overrule the Chapmans' first and second issues.

---

**5.** The Chapmans rely on the provision that states, "Seller shall cure the timely objections of Buyer or any third party lender within 15 days from the date Seller receives the objec-
tions and the Closing Date will be extended as necessary. *If objections are not cured by the extended Closing Date, this contract will terminate*" (emphasis added).

**B. Is there legally and factually sufficient evidence to support a finding that the Olbrichs were excused from tendering performance because such a tender would have been futile?**

In their third and fourth issues, the Chapmans argue the trial court erred in denying their motions for directed verdict and judgment notwithstanding the verdict and in awarding the Olbrichs specific performance because the Olbrichs never tendered their own performance as required under the contract. The Chapmans argue the Olbrichs tendered a nonconforming performance and thus this tender was insufficient as a predicate for specific performance. The Olbrichs counter that the Chapmans had no intention of fulfilling their obligations under the contract as demonstrated by their sale of Lot 21 to the Medranos despite a recorded notice of lis pendens and a lawsuit by the Olbrichs seeking specific performance. Pointing to these circumstances, the Olbrichs posit that any actual tender would have been futile and, consequently, all that was required was a tender of performance in their pleadings.

■ In analyzing no-evidence issues, we must consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 821. Specific performance is an equitable remedy committed to the trial court's discretion. *Bell v. Rudd*, 144 Tex. 491, 191 S.W.2d 841, 843 (1946); *Roundville Partners, L.L.C. v. Jones*, 118 S.W.3d 73, 79 (Tex.App.-Austin 2003, pet. denied). The parties seeking specific performance must demonstrate that they have performed, or tendered performance, of their obligations under the contract. *American Apparel Prods., Inc. v. Brabs, Inc.*, 880 S.W.2d 267, 269 (Tex.App.-Houston [14th Dist.] 1994, no writ). Tender of performance is excused under certain circumstances, such as when a tender would be futile or when the defendants have repudiated the contract. *See Burford v. Pounders*, 145 Tex. 460, 199 S.W.2d 141, 144–45 (1947); *Henry v. Mr. M. Convenience Stores, Inc.*, 543 S.W.2d 393, 394–96 (Tex. App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.).

*The evidence is legally sufficient to support a finding that the Olbrichs were excused from tendering performance because of the Chapmans' repudiation of the contract.*

■ Under precedent from the Texas Supreme Court and this court, the tender-of-performance requirement for specific-performance claims is excused if the defendants have repudiated the contract. *See Burford*, 199 S.W.2d at 144–45; *Henry*, 543 S.W.2d at 394–96. A party repudiates a contract if the party manifests, by words or actions, a definite and unconditional intention not to perform the contract according to its terms. *Builders Sand, Inc. v. Turtur*, 678 S.W.2d 115, 120 (Tex.App.-Houston [14th Dist.] 1984, no writ).

In *Burford*, defendant Beaird leased property to plaintiff Burford. The lease required Beaird to give Burford the opportunity to purchase the land before Beaird sold the property to anyone else. Without giving Burford this opportunity, Beaird sold the property to a third party. *Burford*, 199 S.W.2d at 142. The court recognized that a tender by Burford in this situation would have been a "useless act" or "idle ceremony." *Burford*, 199 S.W.2d at 144–45. Because "Beaird put himself in an attitude of default, and repudiated the contract by selling to Pounders," the Texas Supreme Court held Burford was not required to tender the purchase price and instead could rely on Burford's offer in his pleadings to "do equity." *Id.* at 145.

The Olbrichs were not required to tender the purchase price because the Chapmans had "put it out of [their] power to perform" by repudiating the contract. *See id.* The Chapmans entered into a binding contract to sell the property in question to the Medranos on July 2, 2002. This contract makes no reference to the Olbrichs or their contract with the Chapmans. Mrs. Chapman informed Mr. Olbrich on July 15, 2002, two weeks after contracting with the Medranos, that "[t]he contract is over" and that the Chapmans had contracted to sell the property to another party.

Although the Olbrichs did not make a formal tender of performance, they were not required to do so. The evidence presented at trial would enable reasonable and fair-minded people to find that the Olbrichs were excused from tendering performance by the Chapmans' repudiation of their contract. There is legally sufficient evidence on this basis alone to support a finding that the Olbrichs were not required to make an actual tender of performance. *See Burford,* 199 S.W.2d at 145; *see also Glass v. Anderson,* 596 S.W.2d 507, 513 (Tex.1980) (holding that buyer's repudiation of contracts to buy real property from seller excused seller from his obligation to tender performance); *17090 Parkway, Ltd. v. McDavid,* 80 S.W.3d 252, 255–57 (Tex. App.-Dallas 2002, pet. denied) (holding that tender of performance was excused because seller repudiated the contract to sell the real estate); *Hubler v. Oshman,* 700 S.W.2d 694, 698 (Tex.App.-Corpus Christi 1985, no writ) (holding buyer was relieved of his obligation to tender his performance to seller because of seller's repudiation of the contract); *Brantley v. Etter,* 662 S.W.2d 752, 758 (Tex.App.-San Antonio 1983, writ ref'd n.r.e.) (holding tender of performance was excused in spe-

cific-performance case because sellers repudiated contract by declaring their intention not to perform it); *Henry,* 543 S.W.2d at 394–96 (concluding that because the contract between Mrs. Henry and Mr. M had been "effectively repudiated" by the conveyance of Mrs. Henry's legal title and by the placement of the restriction on the property, Mr. M was excused from formally tendering performance at closing).

***The evidence is legally sufficient to support a finding that the Olbrichs were excused from tendering performance because such a tender would have been futile.***

Tender of performance is also excused when a tender would be a useless act. *Burford,* 199 S.W.2d at 145; *Wilson v. Klein,* 715 S.W.2d 814, 821 (Tex.App.-Austin 1986, writ ref'd n.r.e.) (stating that actual tender of purchase price, as a prerequisite to equitable remedy of specific performance, is forgiven and a constructive tender will suffice, when acts of defendant or situation of property is such that an actual tender would have been "a useless act, an idle ceremony or wholly nugatory"). There is evidence that the Chapmans repudiated the contract. They told the Olbrichs that it was no longer in effect, contracted to sell the same property to the Medranos, and closed on this sale with the Medranos despite the pendency of this lawsuit and a recorded lis pendens. Even after being told the contract was "over" and that the Chapmans had decided to sell the property to another party, the Olbrichs still offered to close and proposed various ways to proceed with the sale. Indeed, on July 20, 2002, the Olbrichs offered to pay for a survey not required by the contract and to close, paying the $20,000 contract price in exchange for title to only 17,500 square feet of the 20,825 square feet cov-

ered by the contract.[6] This proposal would have allowed the Chapmans to retain title to the area in which the pool was located and enabled them to avoid the expense of filling in the pool as required by the contract. If the Chapmans' past repudiation of the contract left any doubt as to whether tender of performance under the exact contract terms would have been futile, the Chapmans' refusal to close on terms much more favorable to them is clear and compelling evidence that tendering performance under the contract terms would have been a useless act. Therefore, reasonable and fair-minded people could find that the Olbrichs were excused from tendering performance because such a tender would have been futile.[7] *See Burford,* 199 S.W.2d at 144–45. Consequently, the trial court did not err in ordering specific performance in this case or in denying the Chapmans' motions for directed verdict and judgment notwithstanding the verdict based on the argument that the Olbrichs never tendered performance.[8] We over-rule the Chapmans' third and fourth issues.

**C. Did the trial court abuse its discretion in refusing to admit the Olbrichs' response to requests for disclosure into evidence?**

In their fifth issue, the Chapmans contend that the trial court erred in excluding Defendants' Exhibit 5 from evidence. The Chapmans claim that this exhibit was the Olbrichs' response to the Chapmans' requests for disclosure under Texas Rule of Civil Procedure 194. There was an issue at trial as to whether the contract terminated based on the Chapmans' failure to cure the Olbrichs' alleged objection under Paragraph 6.B. The Chapmans asserted that the "Addendum No. 1" to the contract constituted such an objection. However, because Mr. Olbrich denied making such an objection at trial, the Chapmans sought to read to the jury and offer into evidence the Olbrichs' responses to requests for disclosure, which the Chapmans claim contradict this testimony by describing encroach-

---

**6.** The July 20, 2002 letter stated, in relevant part:

According to the survey, the lot measures 119' in width by 175' in length, which totals 20,825 square feet. We will agree to resurvey the lot at our expense to take off 19' in width on the southern side. This will move the boundary line off of the pool and off of the septic tank, and will add 19 more feet in width to the lot on which your house sits.... Rather than asking you for an adjustment in price reflecting the reduced size of the lot, we will maintain the original agreed-to price of $20,000.

This offer allows you to receive your agreed-to price for the lot and frees you up to sell your remaining property without incurring any expense in removing encroachments. We will also be absorbing the cost of the new survey and the loss of square footage without any reduction in price....

**7.** Whether in the jury's answers to questions 1 and 2 or in deemed findings under Texas Rule of Civil Procedure 279, we conclude there are

findings that the Olbrichs were excused from tendering performance by the Chapmans' repudiation of the contract and by the futility of such a tender. *See* Tex.R. Civ. P. 279; *In re J.F.C.,* 96 S.W.3d 256, 262–63 (Tex.2002).

**8.** Even if tender of performance is excused, some courts have concluded that, parties seeking specific performance must plead and prove that they are ready, willing, and able to perform. *See, e.g., Chessher v. McNabb,* 619 S.W.2d 420, 421 (Tex.App.-Houston [14th Dist.] 1981, no writ). However, the Chapmans have not assigned error or argued this issue on appeal, so it is not before this court. *See Pat Baker Co. v. Wilson,* 971 S.W.2d 447, 450 (Tex.1998) (holding that courts of appeals in civil cases cannot reverse a trial court's judgment based on unassigned error). Even if this issue were before us, the Olbrichs' petition is sufficient under a liberal construction, and Mr. Olbrich's trial testimony would support a finding that at all material times the Olbrichs were ready, willing, and able to perform.

ments on the property in question. The trial court sustained the Olbrichs' objection and refused to allow these responses into evidence or to be read to the jury.

 Our appellate record does not contain Defendants' Exhibit 5. After the close of evidence but before closing arguments, the Chapmans, outside the presence of the jury, made the following offer of proof:

Judge, we *had intended to offer during trial* the plaintiff's response to Rule 194.2c. [sic] C is requests [sic] for disclosure, and I would like to read that into the record at this time. This is—this is the response that we had intended and had requested to offer to the jury in this trial.

194—the request Rule 194.2c requests [sic] that the plaintiffs state: The legal theories and, in general, the factual bases of the responding party's claims or defenses, (the responding party need not marshall all evidence that may be offered at trial).

The plaintiffs' response was: Plaintiffs entered into a written contract with Defendants for the purchase from Defendants of Lot 21 of Block 8 of Timberlake Estates in Harris County, Texas (the "Property"). Encroachment [sic] owned by Defendants were found to exist upon the Property. Defendants agreed to remove the encroachments on the Property and assured Plaintiffs that they were progressing with removal of the encroachment.

However, Defendants refused to remove the encroachments on the property as they had agreed and refused to perform under the contract for the sale of the Property.

Further, Defendants have sold the Property to a third party in breach of their agreement to sell to Plaintiffs.

Judge, that completes our offer. That was the response that we had wanted to read to the jury.

(emphasis added). During this offer of proof, the Chapmans did not tender the document in question to the trial court, nor did they identify the responses in question as the same as those contained in Defendants' Exhibit 5. Given that the trial court previously had denied the Chapmans' request that Defendants' Exhibit 5 be admitted into evidence and read to the jury, the Chapmans' offer of proof seems to indicate that the responses read by counsel differed from those in Defendants' Exhibit 5 because counsel stated that the Chapmans "had intended to offer during trial" the responses described in the offer of proof. Further, the offer of proof does not mention whether the responses being read were the Olbrichs' latest responses or responses that had been superseded or supplemented. This information is significant because the Texas Rules of Civil Procedure specifically provide that "[a] response to requests under Rule 194.2(c)and (d) that has been changed by an amended or supplemental response is not admissible and may not be used for impeachment." TEX.R. CIV. P. 194.6.

 To adequately and effectively preserve error, an offer of proof must show the nature of the disallowed evidence with sufficient specificity to allow the reviewing court to determine its admissibility. *Bohatch v. Butler & Binion,* 905 S.W.2d 597, 607 (Tex.App.-Houston [14th Dist.] 1995), *aff'd,* 977 S.W.2d 543 (Tex.1998). Our record does not contain Defendants' Exhibit 5—the document that the Chapmans assert should have been admitted into evidence or read to the jury. The Chapmans' offer of proof does not make it clear that the responses read into the record are the same as those that were contained in Defendants' Exhibit 5. Further, the offer of

proof does not describe these responses specifically enough to allow this court to determine whether the trial court erred. Therefore, the Chapmans have not preserved error as to their fifth issue. Accordingly, we overrule the Chapmans' fifth issue.[9]

**D. Did the trial court err in offsetting the purchase price of the property against the attorney's fees awarded to the Olbrichs?**

In their sixth issue, the Chapmans contend that the trial court erred in offsetting the purchase price of Lot 21 against the attorney's fees awarded to the Olbrichs. In its final judgment, rather than awarding the Olbrichs $55,000 for their attorney's fees and ordering the Olbrichs to pay the Chapmans $20,000 (the purchase price of Lot 21), the trial court offset the purchase price against the award of attorney's fees and granted a judgment against the Chapmans stating, in relevant part:

> It is further, ORDERED, ADJUDGED, and DECREED that, after applying TWENTY THOUSAND AND NO/100 DOLLARS ($20,000.00) (the purchase price of Lot 21), of Plaintiffs' recovery of attorney's fees against Defendants, that Plaintiffs, Douglas and Eleanor Olbrich, do have and recover of and from Defendants, James and Patricia Chapman, the sum of THIRTY–FIVE THOUSAND AND NO/100 DOLLARS ($35,000.00) as reasonable and necessary attorney's fees awarded by the jury to Plaintiffs, who are the prevailing parties.

Instead of requiring the Olbrichs to pay the Chapmans the purchase price of the land, the trial court deducted the purchase price of the land from the attorney's fees award. The Chapmans contend that this offset was made in error because the prop-

erty was part of their protected "homestead." We disagree and conclude that the Chapmans failed to establish that this property was their homestead.

■ The proceeds from the sale of a homestead are protected only if the existence of a homestead is first proved. *Burk Royalty Co. v. Riley,* 475 S.W.2d 566 (Tex.1972); *Savell v. Flint,* 347 S.W.2d 24 (Tex.Civ.App.-Eastland 1961, writ ref'd n.r.e.) (holding that the evidence raised a fact issue as to whether claimants lived at a new truck stop claimed as a homestead when the deed of trust was executed); *Vaughn v. Vaughn,* 279 S.W.2d 427, 436 (Tex.Civ.App.-Texarkana 1955, writ ref'd n.r.e.) (holding that in an action by widow to require husband's executor to set aside three tracts of land for her use as homestead, the widow had the burden of showing that the forty-eight-acre tract was a homestead even though it was not contiguous to land on which widow's residence was located and had never been farmed by husband).

■ One who desires to avail himself of a homestead right must assert that right. *Bouldin v. Woosley,* 525 S.W.2d 276, 280 (Tex.Civ.App.-Waco 1975, no writ) (holding that if a homestead exemption is relied upon, either as a claim or defense, it must be pleaded and proven); *Roberson v. Home Owners' Loan Corp.,* 147 S.W.2d 949, 953 (Tex.Civ.App.-Dallas 1941, writ dism'd judgm't cor.) (stating that "[h]omestead exemption is a right conferred by law upon the head of a family, and unless he avails himself of the right *by pleadings and proof,* courts cannot assume facts exist against the validity of an existing debt and lien, or that the head of the family wishes to claim the exemption."). Every fact that

---

**9.** Even if the offer of proof had sufficiently described Defendants' Exhibit 5, the record could hardly support a conclusion that the trial court would have reversibly erred in excluding it from evidence or precluding the Chapmans from reading it.

is essential to the existence of the asserted homestead right must be established by "evidence not of [a] doubtful nature." *Vaughn,* 279 S.W.2d at 436. Further, in order to establish homestead rights there must be proof of concurrence of usage and intent on the part of the owner to claim the land as a homestead. *McFarlane v. First Nat'l Bank of Orange, Tex.,* 97 S.W.2d 754, 761 (Tex.Civ.App.-Beaumont 1936, writ ref'd). A family is not entitled to two homesteads at the same time. TEX. CONST. art. XVI, § 51; *Silvers v. Welch,* 127 Tex. 58, 91 S.W.2d 686, 687 (1936).

The alleged violation of the homestead exemption occurred no earlier than on the date of judgment, November 5, 2004. However, the record contains no evidence that the property in question was the Chapmans' homestead on this date. Although the Chapmans cite several pages of the record in an attempt to show that this property was part of their homestead, none of these pages, nor any other pages in the record, mention the word "homestead" or establish that the property was the Chapmans' homestead. Indeed, no property records were offered to establish the homestead exemption. Moreover, although the Chapmans filed an objection to the proposed final judgment stating that this property was part of their homestead, they did not attach any evidence or an affidavit in support of this objection. At trial, the evidence showed that the Chapmans sold the property in question to the Medranos along with adjoining property. This sale closed in August 2002, and the Medranos paid the Chapmans $150,000. Mr. Medrano testified at trial that he purchased the property in question and had been living there for more than two years.

The evidence in the record conclusively proves that the property had not been the Chapmans' homestead for more than two years before November 5, 2004. *See*

*Woolfolk v. Ricketts,* 48 Tex. 28, 30 (Tex. 1877) (holding that evidence that the homestead claimants had removed their residence to another place, with nothing to indicate that the removal was temporary, held sufficient, in favor of one who had bought the property on the faith of it, to show that they had abandoned it as their homestead); *McIntyre v. McIntyre,* 722 S.W.2d 533, 537 (Tex.App.-San Antonio 1986, no writ) (holding that the former husband failed to establish that the marital residence was a homestead, so as to preclude use of proceeds from the sale of the marital residence to pay the former wife's attorney's fees); *Franklin v. Woods,* 598 S.W.2d 946, 949 (Tex.Civ.App.-Corpus Christi 1980, no writ) (stating "[t]here can be no more convincing proof of the intent to abandon than a sale of the homestead"); *Norman v. First Bank & Trust, Bryan,* 557 S.W.2d 797, 801–02 (Tex.Civ.App.-Houston [1 Dist.] 1977, writ ref'd n.r.e.) (holding that removal to a different residence and use and occupancy of it as a homestead, unaccompanied by any act evidencing an intention to return to former home, is evidence that a new homestead has been acquired and the old one abandoned). Accordingly, we overrule the Chapmans' sixth issue.

Having overruled all of the Chapmans' issues, we affirm the trial court's judgment.

HUDSON, J., dissenting.

J. HARVEY HUDSON, Justice, dissenting.

One who seeks specific performance of a real estate contract must prove that he has diligently and timely performed or tendered performance of all obligations set forth in the contract. *Graves v. Alders,* 132 S.W.3d 12, 18 (Tex.App.-Beaumont 2004, pet. denied). Because the Olbrichs did not tender their own performance un-

der the real estate contract at issue, I respectfully dissent.

It is well established that specific performance is an equitable remedy. *Bell v. Rudd,* 144 Tex. 491, 191 S.W.2d 841, 843 (1946). Specific performance is not a matter of right, but, instead, a matter of grace within the court's discretion. *Roundville Partners, L.L.C. v. Jones,* 118 S.W.3d 73, 79 (Tex.App.-Austin 2003, pet. denied). Specific performance may be awarded when a valid contract to purchase real property is breached by the seller. *Id.* at 78–79. The party seeking specific performance must demonstrate compliance with all the terms of the contract in that he has performed, or tendered performance, of all contractual obligations. *American Apparel Prods., Inc. v. Brabs, Inc.,* 880 S.W.2d 267, 269 (Tex.App.-Houston [14th Dist.] 1994, no writ); *Texacally Joint Venture v. King,* 719 S.W.2d 652, 653 (Tex. App.-Austin 1986, writ ref'd n.r.e.).

Where the contract requires a deed to be delivered upon tender of the purchase price, the purpose of a tender is two-fold. *Roundville Partners,* 118 S.W.3d at 79; *Wilson v. Klein,* 715 S.W.2d 814, 821 (Tex. App.-Austin 1986, writ ref'd n.r.e.). First, the valid tender of the purchase price invokes the seller's obligation to convey and places him default if he fails to do so. *Roundville Partners,* 118 S.W.3d at 79; *Wilson,* 715 S.W.2d at 821. Second, the tender satisfies the fundamental prerequisite of specific performance, i.e., that the buyer demonstrate he has done or offered to do, or is then ready and willing to do, all the essential and material acts which the contract requires of him. *Roundville Partners,* 118 S.W.3d at 79; *Wilson,* 715 S.W.2d at 821.

The Chapmans argue the Olbrichs never tendered their own performance as required under the contract, but tendered, at best, a nonconforming performance. The Olbrichs, on the other hand, argue the Chapmans had no intention of complying with the contract as evidenced by their sale of Lot 21 to the Medranos in the face of a recorded notice of lis pendens and the Olbrichs' pleadings seeking specific performance. Thus, the Olbrichs contend any actual tender, under these circumstances, would have been a useless act. Accordingly, the Olbrichs claim they were required only to tender performance in their pleadings.

"[A] formal tender is excused where a tender would be a useless and idle ceremony." *Burford v. Pounders,* 145 Tex. 460, 199 S.W.2d 141, 145 (1947) (citations omitted). Thus, the tender of the purchase price "is excused where the vendor or seller has put it out of his power to perform, as where he has conveyed the property . . . to a third person." *Id.* (citations omitted). In *Burford,* a lease gave Burford the right of refusal of purchase of the land before Beaird sold the property to a third party. Beaird nevertheless sold the property to a third party without giving Burford the right of first refusal. *Id.* at 141–42. Because "Beaird put himself in an attitude of default, and repudiated the contract by selling to Pounders," the supreme court held Burford was not required to actually tender the purchase price, but, instead, it was sufficient for Burford to offer in his pleadings to do equity. *Id.* at 145.

In *Henry v. Mr. M Convenience Stores, Inc.,* we also considered an award of specific performance in light of the repudiation of a contract for the sale of property. 543 S.W.2d 393 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.). Mr. M entered into an earnest money contract with Mrs. Henry for the sale of property "located in a fashionable section of Houston." *Id.* at 394. Three days prior to the scheduled closing, Mrs. Henry conveyed

the property by way of general warranty deed to Laigle (another residential property owner in the neighborhood), as trustee for thirteen named individuals, who were concerned about the possibility of a commercial enterprise being located in their neighborhood. *Id.* Laigle then executed a deed of trust and security agreement in favor of a bank. *Id.* at 394–95. Simultaneously, with the attempt to fix a lien in favor of the bank, Laigle executed a second deed of trust in favor of Mrs. Henry. *Id.* at 395. Laigle also executed and filed of record instruments placing certain restrictions on the property to limit the use of the property to a residential purpose in direct contravention to the commercial intentions of Mr. M. *Id.* We found that because the contract between Mrs. Henry and Mr. M had been "effectively repudiated" by the conveyance of Mrs. Henry's legal title and by the placement of the restriction on the property, Mr. M was excused from formally tendering performance at closing. *Id.*

The Olbrichs contend that after notifying the Chapmans that they intended to claim specific performance, demanding an immediate closing, threatening to file a notice of lis pendens, offering to purchase a smaller Lot 21 without the pool, filing a lawsuit, and actually filing of a notice of lis pendens, any tender would have been an idle act. Thus, the Olbrichs argue they were excused from the requirement of actual tender and claim that the constructive tender in their pleadings was sufficient. The Olbrichs assert they were ready, willing, and able to close on June 7, 2002, but there was no further contact with the Chapmans until July 15. However, unlike the sellers in *Burford* or *Henry*, when the Olbrichs filed suit on July 22, 2002, the Chapmans still owned the property and did not close with the Medranos until "August the 8th or 9th," 2002. Moreover, by their July 20, 2002 letter, the Olbrichs

apparently believed the Chapmans would be willing to sell Lot 21 to them two days prior to filing this lawsuit.

The Olbrichs rely on *17090 Parkway, Ltd. v. McDavid* in support of their argument that any actual tender would have been a useless act or idle ceremony. 80 S.W.3d 252 (Tex.App.-Dallas 2002, pet. denied). In *17090 Parkway, Ltd.,* the court of appeals considered the necessity of an actual tender when the seller of an office building notified the purchaser in writing that he was terminating the sales contract. *Id.* at 255. The court of appeals rejected the seller's argument that the buyer had to actually tender the full purchase price to be entitled to specific performance. *Id.* at 257. Noting that "where a defendant openly refuses to perform his part of a contract, a plaintiff need not tender performance before bringing suit," the court observed that because the seller had terminated the contract and would not have conveyed the property to the buyer if he had tendered the purchase price, actual tender would have been a useless act. *Id.* at 256–57. Unlike in *17090 Parkway,* the Chapmans never told the Olbrichs *they* were terminating the contract; rather, the Chapmans simply stated they believed the contract had expired. Indeed, the original closing date was May 25, 2002. It was extended to June 9, 2002. By July 15, 2002, the Chapmans believed the contract was over. Further, there was no jury finding that the Chapmans had "openly refused to perform [their] part of the contract."

When a party seeks specific performance, he must show that he has complied with all the terms of the contract in that he has performed, or tendered performance, of all contractual obligations. *American Apparel Prods., Inc.,* 880 S.W.2d at 269; *Texacally Joint Venture,* 719 S.W.2d at 653. This is true even where the other

party has indicated that he will not carry out the contract. *Riley v. Powell*, 665 S.W.2d 578, 581 (Tex.App.-Fort Worth 1984, writ ref'd n.r.e.); *Hamon v. Allen*, 457 S.W.2d 384, 390 (Tex.Civ.App.-Corpus Christi 1970, no writ); *Walker v. Central Freight Lines, Inc.*, 382 S.W.2d 125, 130 (Tex.Civ.App.-San Antonio 1964, writ ref'd n.r.e.). At the time the Olbrichs filed this suit, the Chapmans still owned Lot 21. The Chapmans may have indicated that they would not sell Lot 21 to the Olbrichs, but they had not "put it out of [their] power to perform" by having already conveyed to the property to a third party. *Burford*, 199 S.W.2d at 145.

The Olbrichs complain the Chapmans refused to respond to their July 16 demand to close and their July 20 offer to purchase a smaller Lot 21. On July 16, 2002, the Olbrichs notified the Chapmans that they were claiming specific performance and demanded an immediate closing, with the Olbrichs' thereafter tendering payment with reimbursement of the cost of removing the pool and attorney fees.[1]

The contract provided that the sales price of $20,000 was payable in cash at closing. There is nothing in the contract allowing the purchaser to tender the purchase price after closing. Nor is there any provision in the contract allowing for any decrease in the purchase price, i.e., reimbursement for removal of the encumbrance and attorney fees, as demanded in the July 16, 2002 letter. "It is well settled in Texas that a party cannot himself disaffirm a part of a contract and at the same time enforce specific performance on the part of the other party." *Jones v. Riley*, 471

S.W.2d 650, 657 (Tex.Civ.App.-Fort Worth 1971, writ ref'd n.r.e.). Thus, the Olbrichs cannot insist upon the Chapmans' performance under the contract when they have not only failed to comply with the terms of the contract by not tendering the full purchase price, but they actually sought to modify the terms of the contract.

Relying on *McMillan v. Smith*, the Olbrichs contend the July 16, 2002 letter is immaterial to whether they are entitled to specific performance because the Chapman's default excuses an actual tender of performance thereby rendering the unconditional tender in their pleadings sufficient. 363 S.W.2d 437 (Tex.1962). In *McMillan*, the sellers were in default when the tender was made because they had failed to show good title and had failed and refused to cure certain defects. *Id.* at 439. The buyers pleaded they were ready, willing, and able to carry out the contract, offered to do complete equity, *deposited in the court* the amount they regarded as owing, and offered to deposit any additional amounts as determined by the court. *Id.* at 440. Observing that the contract was difficult to construe and that the buyers had tendered the amount they believed in good faith due under the contract and offered to tender any additional amounts the court found to be due, the court held, under these circumstances, that failure to tender the amount actually due did not preclude specific performance once they had paid the full amount. *Id.* at 443.

*McMillan* does not stand for the proposition that the purchaser does not have to tender the purchase price if the seller is in default under the contract. Unlike the

---

1. The July 16 letter states, in relevant part:
 [W]e intend to claim specific performance for the contract, meaning that we want to close immediately and *thereafter* tender performance by contracting for removal of the encroachment on the subject property, including removal of fencing, pool demolition and filling of the pool void as specified in Addendum # 1, with reimbursement to us of associated expenses and any attorney fees.

buyers in *McMillan*, the Olbrichs did not tender into the registry of the court any sum due under the contract, but, instead, demanded an immediate closing and, thereafter, tender an amount that was clearly less than the amount of the purchase price stated in the contract.

A tender is an *unconditional* offer by the obligor to pay a sum not less than what is due to the obligee. *Baucum v. Great Am. Ins. Co. of N.Y.*, 370 S.W.2d 863, 866 (Tex.1963). Thus, any offer by the obligor that is less than what is due under the contract does not constitute a tender and it is the obligor's burden to make sure his tender is of a sufficient amount. *Wilson*, 715 S.W.2d at 821. Here, the Olbrichs cannot condition any tender of their performance on removal of the pool, claiming reimbursement not provided for in the contract. *See id.* ("[T]he very definition of 'tender' does not even allow for the possibility of *conditional* offers.") (emphasis in original).[2]

On July 20, 2002, the Olbrichs proposed to purchase Lot 21, but reduced in size by 3,325 square feet so that the boundary line would be moved and the swimming pool would be located solely on the Chapman's property, for the original $20,000 purchase price.[3] However, the Olbrichs' July 20, 2002 offer to purchase a smaller portion of

Lot 21 poses similar problems for the Olbrichs as the demands found in the July 16, 2002 letter because they are still attempting to change the terms of the contract. Thus, the Olbrichs cannot complain of the Chapmans' refusal to accede to the July 16 demands or accept the July 20 offer to bolster their position that making an actual tender of the full purchase price under the contract was excused because it would have been a useless act under the facts of this case.

Because the Olbrichs failed to establish that they complied with all terms of the contract by performing, or tendering performance, of all contractual obligations, they are not entitled to the equitable remedy of specific performance. Accordingly, I would reverse the judgment of the trial court and render judgment that the Olbrichs take nothing on their claims for specific performance and attorney fees against the Chapmans. I must, therefore, respectfully dissent.

## SUPPLEMENTAL OPINION

### KEM THOMPSON FROST, Justice.

In their motion for rehearing, appellants James and Patricia Chapman assert a single ground—that, in our opinion of June 29, 2006, this court erred by failing

---

2. In post-submission briefing, the Olbrichs argue the July 16, 2002 letter with the nonconforming tender is irrelevant because they abandoned any claimed reductions related to the removal of the pool after the Medranos purchased the lot. Even if this were so, it does not change the result. Because of the reasons explained above, the Olbrichs were required to make an actual tender of the $20,000 purchase price prior to filing suit.

3. The Olbrichs' proposal is contained in a letter dated July 20, 2002:

 According to the survey, the lot measures 119' in width by 175' in length, which totals 20,825 square feet. We will agree to resurvey the lot at our expense to take off

 19' in width on the southern side. This will move the boundary line off the pool and off of the septic tank, and will add 19 more feet in width to the lot on which your house sits.... Rather than asking you for an adjustment in price reflecting the reduced size of the lot, we will maintain the original agreed-to price of $20,000.

 This offer allows you to receive your agreed-to price for the lot and frees you up to sell your remaining property without incurring any expense in removing encroachments. We will also be absorbing the cost of the new survey and the loss of square footage without any reduction in price....

to address the argument that appellees Doug and Eleanor Olbrich forfeited their right to seek specific performance by allegedly repudiating the parties' contract when they tendered performance that did not conform to the contract. The Chapmans assert that they raised this repudiation argument by their third and fourth issues and the argument thereunder. These issues and argument, in the aggregate, consume fewer than three pages of the Chapmans' appellate brief. After reviewing the Chapmans' entire brief, with particular attention to these pages, we conclude that the Chapmans did not assign error as to this repudiation argument. Furthermore, the Chapmans waived this issue by failing to set forth some specific argument and analysis with supporting authorities and record citations. *San Saba Energy, L.P. v. Crawford,* 171 S.W.3d 323, 338 (Tex.App.-Houston [14 Dist.] 2005, no pet.) (holding that, even though courts interpret briefing requirements reasonably and liberally, parties asserting error on appeal still must put forth some specific argument and analysis citing the record and authorities in support of the parties' argument).

The Chapmans' brief states that the Olbrichs not only failed to tender their own performance under the contract but also tendered a nonconforming performance. However, in this part of their brief, the Chapmans assert that the trial court erred in denying their motions for directed verdict and for judgment notwithstanding the verdict and in awarding specific performance because the Olbrichs did not prove that they diligently and timely performed, or tendered performance of, all the Olbrichs' obligations under the contract. While the Chapmans mentioned two different ways in which the Olbrichs allegedly violated this requirement—(1) not tendering performance under the contract and (2) tendering performance but not under the

terms of the contract—the Chapmans never asserted that the Olbrichs forfeited their right to seek specific performance by repudiating the parties' contract. Indeed, the Chapmans did not use the words "repudiate" or "repudiation" anywhere in their third or fourth issues or the argument thereunder, nor did they urge the repudiation argument they now assert on rehearing. Moreover, the cases the Chapmans cite under these two issues do not address whether parties forfeit their right to seek specific performance by repudiating the parties' contract through a nonconforming tender of performance.

Under these circumstances, we conclude the Chapmans did not present the argument in question on original submission; therefore, this court did not err in failing to address it. Because the only ground the Chapmans assert on rehearing lacks merit, we overrule their motion for rehearing.