**Opinion issued March 5, 2026.**



In the

# Court of Appeals

for the

# First District of Texas

_____

## NO. 01-24-00475-CV

_____

**AMAZING PAWS, LLC, Appellant**

**v.**

**MELISSA PEDRAZA, Appellee**

---

**On Appeal from the County Court at Law No. 4 and Probate Court**
**Brazoria County, Texas**
**Trial Court Case No. CI64165**

---

## MEMORANDUM OPINION

After a bench trial, the trial court rendered judgment in favor of appellee Melissa Pedraza on her counterclaim against appellant Amazing Paws, LLC and its principal, Ekiria Collins, and ordered that Amazing Paws take nothing. Amazing

Paws challenges the sufficiency of the evidence and argues that Collins cannot be jointly and severally liable for Amazing Paws' obligations. We affirm.

## Background

Amazing Paws is a dog-breeding business that entered multiple written agreements with Pedraza governing the mating and breeding of dogs in Pedraza's care. From June to December 2021, the parties entered agreements covering the following dogs: Fendi, Chanel, Honey, Storm, Gizmo, and Benz.[1] Each agreement follows the same basic structure: Pedraza agrees to care for and mate or breed the specified dog in her home; in exchange, Amazing Paws agrees to market any puppies the dog produces at its expense and share the profits from the sale of puppies with Pedraza. Each agreement states that there is a "two-year" commitment or a "two-litter" requirement, or both. Under none of the agreements does Pedraza agree to a date by which she must successfully breed or mate any of the dogs.

At the time of contracting, Pedraza owned Fendi and Chanel. Amazing Paws originally owned Honey, Storm, and Gizmo, and gave Pedraza the option to purchase them, which Pedraza elected to do in installments.[2] According to an

---

[1]  The parties sometimes refer to Honey and Benz by their prior names, TickTock and Mercedes, respectively. To avoid confusion, we refer to them only as Honey and Benz.

[2]  In its brief, Amazing Paws contends that it also originally owned Benz and that Pedraza failed to pay in full for him. At trial, Collins testified that another

August 3, 2021 purchase receipt, Pedraza made several payments toward purchasing Honey in June and July 2021, leaving a balance of $1,499. On October 10, 2021, Pedraza made a partial payment for Storm using profits from the sale of puppies from Chanel's first litter. After that partial payment, Pedraza still owed $1,000 for Storm. By the time of trial, Pedraza had paid for Gizmo in full. Collins retained the registration and ownership papers for Honey, Storm, and Gizmo.

On January 24, 2022, Collins, Amazing Paws' CEO, sent a series of text messages to Pedraza: "Don't Zelle me nothing[.] I'm cancelling all contracts[.] Melissa [Pedraza] will have to pay ALL her balances by today if she wants papers[.]" At trial, Collins testified that she sent the text messages, and Pedraza testified that she received them. At the time Collins sent the text messages, Pedraza had not met the two-year or two-litter commitment, as applicable, under any of the agreements. She still owed Amazing Paws $1,499 for Honey and $1,000 for Storm. Pedraza testified that she had not made further payments because Collins canceled the contracts, but she remained willing to pay off both balances. There is no evidence in the record that Amazing Paws or Pedraza continued to perform any of the agreements following the January 24, 2022 text messages.

---

individual or entity—not Amazing Paws or Collins—owned Benz. Amazing Paws points to no written or oral agreement in the record reflecting any obligation of Pedraza to pay Amazing Paws for Benz.

On June 7, 2022, Amazing Paws filed suit against Pedraza for breach of the agreements. Pedraza filed a breach-of-contract counterclaim against Amazing Paws and a third-party claim against Collins, who was added to the suit as a third-party defendant. Following a bench trial, the trial court rendered judgment in favor of Pedraza and ordered that Amazing Paws take nothing. Amazing Paws timely filed a notice of appeal.

## Findings of Fact and Conclusions of Law

Amazing Paws timely requested that the trial court issue findings of fact and conclusions of law. *See* TEX. R. CIV. P. 296 (allowing party to request written findings of fact and conclusions of law following bench trial within 20 days after judgment signed). The trial court did not issue any written findings or conclusions, and Amazing Paws did not timely file and serve a "Notice of Past Due Findings of Fact and Conclusions of Law." *See* TEX. R. CIV. P. 297. When a party fails to timely file such a notice, any appellate complaint that the trial court did not issue written findings of fact and conclusions of law is waived. *Guillory v. Boykins*, 442 S.W.3d 682, 694 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

Where, as here, the trial court does not issue findings of fact and conclusions of law, we imply all facts necessary to support the judgment that are supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Moody v. Nat'l W. Life Ins. Co.*, 634 S.W.3d 256, 283 (Tex. App.—

4

Houston [1st Dist.] 2021, no pet.). We uphold the judgment if it can be upheld on any legal theory supported by the evidence. *Moody*, 634 S.W.3d at 283 (citing *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990); *J.C. Penney Co. v. Ozenne*, 453 S.W.3d 509, 513 (Tex. App.—Dallas 2014, pet. denied)).

## Statute of Frauds

Amazing Paws challenges the trial court's implied finding that it repudiated all the agreements. Amazing Paws argues that the January 24, 2022 text messages are ineffective to repudiate the agreements because they are not signed, and thus not writings sufficient to satisfy the statute of frauds.[3] Amazing Paws' argument rests on two contentions: First, Amazing Paws contends that the statute of frauds applies to all the agreements at issue because none of the agreements—which require "two-year" or "two-litter" commitments—can be performed within one year. *See* TEX. BUS. & COM. CODE § 26.01(b)(6). Second, Amazing Paws contends that a communication repudiating a contract to which the statute of fraud applies must be in writing. In response, Pedraza does not dispute either of those contentions. Rather, she appears to argue that a writing is not required to cancel any of the agreements because of Amazing Paws' prior material breaches.

---

[3] This is Amazing Paws' second issue; however, whether the January 24, 2022 text messages are writings that satisfy the statute of frauds is a threshold issue that affects our determination of whether sufficient evidence supports the trial court's implied finding that Amazing Paws repudiated all its agreements with Pedraza. Accordingly, we address this issue first.

We assume, without deciding, that the statute of frauds requires repudiations to be in writing if the statute of frauds would require the underlying agreement or promise to be in writing. Whether a writing satisfies the statute of frauds is a question of law that we review de novo. *Dynegy, Inc. v. Yates*, 422 S.W.3d 638, 642 (Tex. 2013); *see Wiggins v. Cade*, 313 S.W.3d 468, 472 (Tex. App.—Tyler 2010, pet. denied) (holding that sufficiency of property description is question of law reviewed de novo); *Bright & Co. v. Holbein Fam. Min. Tr.*, 995 S.W.2d 742, 745 (Tex. App.—San Antonio 1999, pet. denied) (holding that sufficiency of writing acknowledging barred debt is question of law reviewed de novo).

Under the Texas statute of frauds, agreements "not to be performed within one year from the date of making the agreement" are not enforceable "unless the promise or agreement" is (1) in writing and (2) "signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him." TEX. BUS. & COM. CODE § 26.01. Under section 322.007(d) of the Texas Business and Commerce Code, "[i]f a law requires a signature, an electronic signature satisfies the law." TEX. BUS. & COM. CODE § 322.007(d). An electronic signature is "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." *Id.* § 322.002(8). We have previously held that the "from" field in an email communication authenticates the writing in an email to be the sender's and

6

functions as a signature under section 322.002(8) of the Texas Business and Commerce Code. *Khoury v. Tomlinson*, 518 S.W.3d 568, 575-77 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Such an electronic signature satisfies the statute of fraud's "signed" requirement. *Id.* Applying the same rationale, we conclude that the "from" field in a text-message communication authenticates the writing in the text message to be the sender's and functions as a signature. The sender's phone number is apparent from the face of the text message. Collins acknowledged that the phone number from which the text messages were sent belonged to her and that she sent the text messages. To the extent that the statute of frauds required Amazing Paws' repudiation to be in writing, we conclude that the January 24, 2022 text messages are sufficient writings signed by Collins, a person authorized to sign for Amazing Paws.

## Breach of Agreements

Amazing Paws contends that the trial court erred by failing to find that Pedraza breached the agreements.

### A.    Nature of Challenge

Amazing Paws does not state whether it challenges the trial court's implied no-breach finding for factual or legal insufficiency, or both. When an appellant's brief is ambiguous as to whether the appellant raises a factual or legal sufficiency challenge, we look to the brief's standard-of-review section, argument, and prayer

7

for relief to determine the nature of the challenge. *See Magana v. Citibank, N.A.*, 454 S.W.3d 667, 681 n.11 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (examining prayer for relief to determine applicable standard of review), *overruled on other grounds by Kinsel v. Lindsey*, 526 S.W.3d 411 (Tex. 2017); *Benavente v. Granger*, 312 S.W.3d 745, 747-48 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (analyzing sections of brief to determine nature of challenge); *Gray v. Entis Mech. Servs., LLC*, No. 01-11-00129-CV, 2012 WL 1454485, at *3 (Tex. App.—Houston [1st Dist.] Apr. 26, 2012, no pet.) (mem. op.) (interpreting appellant's issues as legal sufficiency challenges where standard-of-review section recited no-evidence standard).

Here, Amazing Paws recites the standards of review for legal and factual sufficiency, but it applies neither standard. The prayer for relief requests that this Court "reverse and remand the trial court's judgment in its entirety" without a specific demand in its brief for a new trial or further proceedings in the trial court. In the body of its brief, Amazing Paws contends that it presented "conclusive" evidence of the existence of the agreements and states, without qualification, that Pedraza breached the agreements. Because it is unclear whether Amazing Paws challenges the legal or factual sufficiency of the evidence, we will address both. *See Burns v. Rochon*, 190 S.W.3d 263, 267 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("Because it is unclear whether Burns is challenging the legal or the

factual sufficiency of the evidence, we will address both."); *Rundle v. Comm'n for Law. Discipline*, 1 S.W.3d 209, 212 (Tex. App.—Amarillo 1999, no pet.) (treating "insufficient evidence" challenge as a legal and factual sufficiency challenge).

**B.      Standard of Review**

In an appeal from a judgment rendered after a bench trial, the trial court's findings of fact have the same weight as a jury's verdict, and we review the legal and factual sufficiency of the evidence used to support them just as we would review a jury's findings. *Woods v. Kenner*, 501 S.W.3d 185, 195 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994)).

In a legal sufficiency challenge, we review the evidence in a light most favorable to the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *Dao v. Mission Bend Homeowners Ass'n, Inc.*, 667 S.W.3d 304, 317 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 269 (Tex. App.—Houston [1st Dist.] 2018, pet. dism'd)). If evidence falls within this "zone of reasonable disagreement," we cannot substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822. When an appellant attacks the legal sufficiency of an adverse finding on an issue on which it

bears the burden of proof, the party must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Jones v. Pesak Bros. Constr., Inc.*, 416 S.W.3d 618, 624 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citing *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001)). When an appellant does not bear the burden of proof, it must show that no evidence supports the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

When reviewing the factual sufficiency of the evidence on an issue on which the appellant bears the burden of proof, we set aside an adverse finding only if it is "against the great weight and preponderance of the evidence." *Dow Chem.*, 46 S.W.3d at 242 (citation modified) (citing *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983)). When the party bears the burden of proof, we examine all the evidence in the record relevant to that finding and set it aside only if it is "so weak, or so contrary to the overwhelming weight of all the evidence." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016) (citation modified).

In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the factfinder is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819; *Hinkle v. Hinkle*, 223 S.W.3d 773, 782 (Tex. App.—Dallas 2007, no pet.). We may not substitute our judgment for the factfinder's, even if we would

reach a different answer on the evidence. *Maritime Overseas Corp.*, 971 S.W.2d 402, 407 (Tex. 1998); *Hinkle*, 223 S.W.3d at 782.

**C.    Analysis**

To prevail on a breach-of-contract claim, a plaintiff must prove: (1) the existence of a valid contract, (2) the plaintiff performed or tendered performance as contractually required, (3) the defendant failed to perform or tender performance as contractually required, and (4) the plaintiff sustained damages due to the breach. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 890 (Tex. 2019).

A party's "[t]ender of performance is excused under certain circumstances, such as when a tender would be futile or when the defendants have repudiated the contract." *Chapman v. Olbrich*, 217 S.W.3d 482, 491 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (citation modified). A party repudiates, or anticipatorily breaches, an agreement when it positively and unconditionally refuses to perform the contract in the future, either before performance is due or after partial performance. *W. Loop Hosp., LLC v. Houston Galleria Lodging Assocs., LLC*, 649 S.W.3d 461, 492 (Tex. App.—Houston [1st Dist.] 2022, pet. denied). A party can repudiate a contract "by words or actions." *Chapman*, 217 S.W.3d at 491. The party asserting repudiation bears the burden of proving that the opposing party has absolutely repudiated the contract without just excuse. *Van Polen v. Wisch*, 23

11

S.W.3d 510, 516 (Tex. App.—Houston [1st Dist.] 2000, pet. denied); *W. Loop. Hosp.*, 649 S.W.3d at 492 (noting that party asserting repudiation bears burden of proof); *see Taylor Publ'g Co. v. Sys. Mktg. Inc.*, 686 S.W.2d 213, 217-18 (Tex. App.—Dallas 1984, writ ref'd n.r.e.) (holding that jury finding that party improperly terminated under incorrect interpretation of contract was "tantamount to a finding that [party] repudiated without just excuse").

Because we must uphold the trial court's judgment on any legal theory supported by the evidence, we first determine whether the evidence is legally and factually sufficient to support the trial court's implied finding that Amazing Paws repudiated all its agreements with Pedraza, excusing Pedraza's further performance. Collins is Amazing Paws' chief executive officer. At trial, Collins testified that on January 24, 2022, she sent a series of text to Pedraza that read: "Don't Zelle me nothing[.] I'm cancelling all contracts[.] Melissa [Pedraza] will have to pay ALL her balances by today if she wants papers[.]" Amazing Paws directs us to no evidence in the record that the parties continued performing their obligations under any of the agreements or that Collins or Pedraza demanded the other's performance after the January 24, 2022 text messages. Collins did not market any future litters, did not share in any future profits from the sale of puppies, and never provided registration or breeding papers to Pedraza for Storm, Honey, and Gizmo. Pedraza testified that she was unable to perform her

obligations under the agreements because of Collins' cancellation but she remained willing to perform. We conclude that the evidence is legally and factually sufficient to support an implied finding that Collins repudiated Amazing Paws' agreements with Pedraza through her January 24, 2022 text messages, excusing Pedraza's further performance. *See Chapman*, 217 S.W.3d at 492 (concluding that evidence of repudiation of real-estate contract was legally sufficient where seller said "[t]he contract is over" and entered a contract with other buyers); *World Food Imps., Inc. v. HHO United Grp., Inc.*, No. 05-22-01160-CV, 2024 WL 4553211, at *7 (Tex. App.—Dallas Oct. 23, 2024, pet. denied) (mem. op.) (concluding that evidence of repudiation was legally and factually sufficient where party announced "it would not close the deal" and failed to attend closing).

Having found legally and factually sufficient evidence that Collins repudiated the parties' agreements on January 24, 2022, we next determine whether Amazing Paws conclusively established Pedraza's breach of the agreements prior to that date or whether the trial court's implied no-breach finding is against the great weight and preponderance of the evidence. *See Koonce v. Barclays Cap. Real Estate Inc.*, No. 01-10-00194-CV, 2011 WL 13385435, at *7-8 (Tex. App.—Houston [1st Dist.] Dec. 22, 2011, no pet.) (mem. op.) (holding party's default was not excused where it occurred prior to other party's alleged breach or repudiation). Amazing Paws contends that Pedraza breached the

agreements by: (1) competing against Amazing Paws, including operating a website for the sale of pets and marketing dogs in a manner similar to Amazing Paws' model; (2) failing to mate or breed each dog for the two-year or two-litter requirement, as applicable, under each agreement; (3) failing to fully pay the outstanding balances for the dogs Storm, Honey, Gizmo, and Benz; (4) failing to obtain Amazing Paws' consent prior to breeding any of the dogs; and (5) failing to mediate prior to the suit. Pedraza responds that she was excused from further performance because Amazing Paws' CEO, Collins, repudiated the agreements and that none of the alleged breaches occurred prior to January 24, 2022, the date of repudiation.

*Competing against Amazing Paws.* Amazing Paws contends that Pedraza breached each agreement by creating her own pet-breeding business and appropriating Amazing Paws' marketing materials. Amazing Paws directs us to no evidence in the record that Pedraza created her own website or used Amazing Paws' marketing materials prior to Collins' text messages canceling all agreements. Additionally, Amazing Paws does not reference, quote, or cite any contractual provision in which Pedraza agreed not to compete with Amazing Paws.

*Failing to mate or breed each dog.* Amazing Paws argues that Pedraza breached each agreement by failing to mate or breed each dog for the required "two-year" or "two-litter" requirement, as applicable. The agreements for Fendi

and Chanel, which are covered under the same agreement, and Storm impose only a "two-year commitment" without requiring a defined number of litters. The agreement for Honey imposes both a "two-year commitment" and a "two-litter requirement." The agreements for Gizmo and Benz impose only a "two-litter requirement" without a defined number of years. When Collins sent her January 24, 2022 text messages, less than a year had elapsed since the parties entered their first contract. Pedraza signed the first agreement—the Fendi and Chanel agreement—on June 24, 2021. For any two-year agreements, more than a year remained for Pedraza to mate or breed the dogs, assuming the specific agreement required her to do so. For any two-litter agreements, those agreements—with the exception of Honey's—did not impose any time by which Pedraza had to produce two litters, and in the case of Honey, more than a year remained for Pedraza to perform at the time of Collins' text messages.

*Failing to pay outstanding balances.* Amazing Paws contends that Pedraza breached the agreements by failing to pay her outstanding balances for Storm, Honey, Gizmo and Benz. Collins testified that Pedraza paid for Gizmo in full and that another entity—not Amazing Paws—owned Benz. Amazing Paws points to no written or oral agreement in the record reflecting any obligation of Pedraza to pay Amazing Paws for Benz. For Storm and Honey, Amazing Paws points to no

15

contractual provision that required Pedraza to fully pay Storm's and Honey's balances on or before January 24, 2022.

*Failing to obtain prior consent for breeding.* Amazing Paws directs us to no evidence in the record that Pedraza mated or bred any of the dogs without Amazing Paws' consent prior to January 24, 2022.

*Failing to mediate.* All of the agreements require that the parties attend mediation for any disputes. Although Collins requested mediation, she could not remember the date on which she made her request. We find nothing in the record to suggest that such a request occurred before January 24, 2022.

We conclude that Amazing Paws has not conclusively established that Pedraza breached any of the agreements prior to January 24, 2022. We further conclude that the trial court's implied finding that Pedraza did not breach any of the agreements prior to January 24, 2022, is not against the great weight and preponderance of the evidence. The evidence is legally and factually sufficient to support the trial court's implied no-breach findings.

## Collins' Liability

In its final issue, Amazing Paws contends that the trial court erred in rendering judgment against Collins because there is no basis for holding Collins personally liable for Amazing Paws' obligations.

No appellate court may "grant a party who does not file a notice of appeal more favorable relief than did the trial court except for just cause." TEX. R. APP. P. 25.1(c). If a party fails to timely file a notice of appeal, we have no jurisdiction to address the merits of that party's appeal. TEX. R. APP. P. 25.1(b); *In re K.L.L.*, 506 S.W.3d 558, 560 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (noting that, without timely notice of appeal, appellate court lacks jurisdiction over appeal); *Brashear v. Victoria Gardens of McKinney, LLC*, 302 S.W.3d 542, 545-46 (Tex. App.—Dallas 2009, no pet.) (noting that timely filing of notice of appeal is jurisdictional prerequisite).

Here, only Amazing Paws, not Collins, filed a notice of appeal. Collins does not appear in the case caption for the notice of appeal, her name is not mentioned in the body of the notice, and Amazing Paws' attorney signed the notice as attorney for "PLAINTIFF" and "Amazing Paws," not on behalf of Collins. Amazing Paws does not challenge the trial court's award of damages to Pedraza. Rather, it complains only that Collins should not be jointly and severally liable for that award. Because Collins did not file a notice of appeal, we cannot grant relief to or for her benefit. TEX. R. APP. P. 25.1(c); *see Pettus v. Pettus*, 237 S.W.3d 405, 422 (Tex. App.—Fort Worth 2007, pet. denied) (holding that appellant could not challenge portion of order affecting party who did not file notice of appeal); *Tex-Hio P'ship v. Garner*, 106 S.W.3d 886, 893 (Tex. App.—Dallas 2003, no pet.)

(holding that court could not grant "relief to or for the benefit of" party who failed to file notice of appeal even if "that relief were to inure ultimately to appellants' benefit").

Even if we had jurisdiction to consider this issue, we must uphold the trial court's judgment on any legal theory supported by the record. *Moody v. Nat'l W. Life Ins. Co.*, 634 S.W.3d 256, 283 (Tex. App.—Houston [1st Dist.] 2021, no pet.). Pedraza argues that Collins is liable under section 171.255 of Texas Tax Code. TEX. TAX CODE § 171.255. Under that statute, "[i]f the corporate privileges of a corporation are forfeited for the failure to file a report or pay a tax or penalty, each director or officer of the corporation is liable for each debt of the corporation that is created or incurred in this state after the date on which the report, tax, or penalty is due and before the corporate privileges are revived." *Id.* § 171.255(a). If corporate privileges are later revived, "the liability under this section of a director or officer of the corporation is not affected by the revival of the charter or certificate and the corporate privileges." *Id.* § 171.255(d); *see Super Ventures, Inc. v. Chaudhry*, 501 S.W.3d 121, 133-35 (Tex. App.—Fort Worth 2016, no pet.) (holding corporate officer could be held liable for debt created after forfeiture but before revival). Section 171.255 applies to limited liability companies that forfeit their right to transact business in the state. TEX. TAX CODE § 171.2515(b). To revive a charter, certificate, or registration forfeited by the secretary of state, the

entity must (1) file each report required by chapter 171 of the Texas Tax Code; (2) pay any required taxes, penalties, or interest due at the time of the request to set aside the forfeiture; and (3) have the forfeiture set aside in a proceeding under section 171.313 of the Texas Tax Code. *Id.* § 171.312; *see id.* § 171.3125 (applying section 171.312 to all taxable entities).

On February 28, 2020, the secretary of state forfeited Amazing Paws' "charter, certificate, or registration." *See id.* § 171.309 (prescribing forfeiture by secretary of state). In December 2023, Amazing Paws filed its annual franchise tax reports dating back to 2019. Regardless of whether the December 2023 filings revived Amazing Paws' certificate of formation and its right to conduct business in Texas, the parties entered the agreements at issue between June and December 2021, after Amazing Paws' forfeiture and well before Amazing Paws' potential revival in December 2023. Accordingly, the trial court's judgment against Collins jointly and severally with Amazing Paws may be upheld on that basis.

## Conclusion

We affirm the judgment of the trial court.

Amparo "Amy" Guerra
Justice

Panel consists of Justices Guerra, Caughey, and Dokupil.

19